1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

MONA Z. HANNA (SBN 131439)
mhanna@mrllp.com
JENNIFER A. MAURI (SBN 276522)
jmauri@mrllp.com
**MICHELMAN & ROBINSON, LLP**
17901 Von Karman Avenue, Suite 1000
Irvine, CA 92614
Telephone:(714) 557-7990
Facsimile: (714) 557-7991

SETH E. DARMSTADTER (admitted *pro hac vice*)
sdarmstadter@mrllp.com
**MICHELMAN & ROBINSON, LLP**
200 South Wacker Drive, Suite 2900
Chicago, IL 60606
Telephone:(312) 638-5671
Facsimile: (312) 638-5672

Attorneys for Plaintiff and Counterclaim Defendant
STRATEGIC PARTNERS, INC.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| STRATEGIC PARTNERS, INC.,<br><br>Plaintiff,<br><br>vs.<br><br>VESTAGEN PROTECTIVE TECHNOLOGIES, INC.,<br><br>Defendant.<br><hr>VESTAGEN PROTECTIVE TECHNOLOGIES, INC.,<br><br>Counterclaim Plaintiff,<br><br>vs.<br><br>STRATEGIC PARTNERS, INC.,<br><br>Counterclaim Defendant. | Case No.:  2:16-CV-5900-RGK<br>Judge:  Hon. R. Gary Klausner<br><br>**PLAINTIFF AND COUNTERCLAIM DEFENDANT STRATEGIC PARTNERS, INC.'S OPENING BRIEF REGARDING ITS CAUSE OF ACTION UNDER CALIFORNIA BUSINESS & PROFESSIONS CODE SECTION 17200**<br><br>**[Filed Concurrently with [Proposed] Order, Declaration of Robert Estrin, and Request for Judicial Notice]**<br><br>Trial Date:  September 19, 2017<br><br>Complaint Filed: August 8, 2016<br><br>Counterclaims Filed: September 19, 2016 |

# **TABLE OF CONTENTS**

I.      INTRODUCTION.............................................................................................. 1

II.     VESTAGEN ENGAGED IN UNLAWFUL AND UNFAIR CONDUCT BY
        VIOLATING FDA AND EPA REGULATIONS IN ITS MARKETING OF ITS
        SCRUBS............................................................................................................ 2

III.    SPI SUFFERED INJURY IN FACT CAUSED BY VESTAGEN'S ACTIONS. ........ 3

IV.     A VIOLATION OF FDA OR EPA REGULATIONS CONSTITUTES A
        VIOLATION OF THE UCL. ............................................................................ 5

V.      VESTAGEN VIOLATED SEVERAL FDA AND EPA REGULATIONS.................. 6

        A.      Vestagen Admitted That It Knowingly Violated FDA Regulations. .................. 6

        B.      Vestagen Admitted That It Knowingly Violated EPA Regulations.................... 9

VI.     CONCLUSION ............................................................................................ 10

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Allergan, Inc. v. Athena Cosmetics, Inc.*,
   640 F.3d 1377 (Fed. Cir. 2011) ............................................................................4

*In re Ferrero Litig.*,
   794 F.Supp.2d 1107 (S.D. Cal. 2011) ...................................................................5

*Ivie v. Kraft Foods Global, Inc.*,
   961 F.Supp.2d 1033 (N.D. Cal. 2013) ..................................................................5

*Krommenhock v. Post Foods, LLC*,
   2017 WL 2378029 (N.D. Cal. June 1, 2017) ........................................................6

*Sandoval v. PharmaCase US, Inc.*,
   145 F.Supp.3d 986 (S.D. Cal. 2015) .....................................................................6

*Schramm v. JPMorgan Chase Bank, N.A.*,
   2013 WL 7869336 (C.D. Cal. Oct. 2, 2013) .........................................................5

*Tracton v. Viva Labs, Inc.*,
   2017 WL 4125053 (S.D. Cal. Sep. 18, 2017) .......................................................6

**California Cases**

*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*,
   20 Cal.4th 163 (1999)........................................................................................2, 3

*Kasky v. Nike Inc.*,
   27 Cal.4th 939 (2002)......................................................................................3, 10

*Kwikset Corp. v. Superior Court*
   51 Cal.4th 310 (2011).............................................................................................3

**Federal Statutes**

21 U.S.C.A § 352.........................................................................................................7, 9

1

2
**California Statutes**

3
California Business & Professions Code

4
§  17200 ("UCL") ................................................................................... *passim*

§  17203 ...............................................................................................................3

5
§  17204 ...........................................................................................................3, 4

6

7
**Federal Codes**

8
Code of Federal Regulations (CFR)

9
21 CFR 807.87(g) ...........................................................................................7,9

21 CFR 807.100(a)(5) .....................................................................................7,9

10
40 CFR 152.25(a) .........................................................................................9, 10

11

12
**Other Federal Authority**

13
Federal Food, Drug, and Cosmetic Act (FDCA) .............................................5,6

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PLAINTIFF AND COUNTERCLAIM DEFENDANT STRATEGIC PARTNERS, INC.'S OPENING BRIEF REGARDING ITS CAUSE OF ACTION UNDER CALIFORNIA BUSINESS & PROFESSIONS CODE §17200**

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.     INTRODUCTION

Strategic Partners, Inc. ("SPI") seeks an injunction under Cal. Bus. & Prof. Code Section 17200 (the "UCL") against Vestagen Protective Technologies, Inc.'s ("Vestagen") based on the undisputed evidence that Vestagen violated FDA and EPA regulations in marketing its VESTEX scrubs.  While SPI seeks no monetary relief under the UCL, an injunction is necessary to prevent Vestagen from continuing to make claims about the public health features of its product that violate FDA and EPA regulations and endanger healthcare workers, their patients and families.

Regulations imposed by the FDA and EPA are specifically designed to protect consumers from misleading and unfounded claims.[1]  The FDA's mission is clear:

> The Food and Drug Administration is responsible for protecting the public health by ensuring the safety, efficacy, and security of . . . medical devices . . .
>
> FDA is responsible for advancing the public health by helping to speed innovations that make medical products more effective, safer, and more affordable and by helping the public get the accurate, science-based information they need to use medical products and foods to maintain and improve their health.  (https://www.fda.gov/aboutfda/whatwedo/).  (RFJN at Ex. 1).

Similarly, the EPA's mission is to "protect human health and the environment" and its purpose is to "ensure that…all Americans are protected from significant risks to human health and the environment where they live, learn and work…" (https://www.epa.gov/aboutepa/our-mission-and-what-we-do) (RFJN at Ex. 2).

The uncontradicted evidence establishes that Vestagen has violated federal regulations designed to protect the health and safety of the public.  At trial, SPI established Vestagen violated FDA and EPA regulations through the testimony of Vestagen's founder Ben Favret, Vestagen's own internal documents, and marketing materials.  This evidence conclusively demonstrated Vestagen had violated FDA and EPA regulations by making public health claims about its product without the proper clearance by the FDA and in violation of EPA

---

[1]  For purposes of SPI's UCL claim, the Court does not need to determine whether Vestagen engaged in false advertising.  The Court only needs to find that Vestagen violated a single FDA or EPA regulation.

regulations.  The uncontradicted evidence shows Vestagen has, and continues to make, claims that its VESTEX scrubs can prevent the transmission of dangerous pathogens and decrease infections.  Under FDA and EPA regulations, these "health claims" may only be made following 510(k) clearance and EPA approval.  Vestagen admitted that it does not have 510(k) clearance and cannot make health claims under the FDA or EPA.

Vestagen's own internal documents showed that *it understood* it could not make the health claims about its product under the FDA and EPA regulations, *but it nevertheless did so, and continues to do so today*.  As a result, consumers will be misled into believing that Vestagen has FDA and EPA approval to make these claims when it does not.  Vestagen's illegal claims are unfair to competitors that comply with FDA and EPA guidelines, and puts consumers at risk.  In fact, the evidence established that over 300 healthcare workers reported complaints of skin rashes, illness, and allergic reactions to Vestagen's scrubs.  Baptist Health purchased these scrubs because  it believed the scrubs would decrease the risk of infection, and consequently, its workers suffered as a direct result of Vestegan's violation of FDA and EPA regulations. There is no price tag sufficient to compensate those who fell ill due to Vestegan's Vestex scrubs and admitted regulatory violations.  Nor, in balancing the interests, is the issuance of an injunction outweighed by the health problems already experienced by over 300 healthcare workers. The issuance of the injunction will serve justice and protect the public from serious health and safety concerns.  Therefore, the Court must enjoin Vestagen's continuing violations of FDA and EPA regulations.

## II.   VESTAGEN ENGAGED IN UNLAWFUL AND UNFAIR CONDUCT BY VIOLATING FDA AND EPA REGULATIONS IN ITS MARKETING OF ITS SCRUBS.

To prevail on its UCL claim, SPI does not need to establish that Vestagen engaged in false advertisement; rather, it only needs to establish that Vestagen engaged in unlawful or unfair practices.  The UCL defines "unfair competition to include any ***unlawful, unfair***, or fraudulent business act or practice." *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal. 4th 163, 180 (1999) (emphasis added).  As this is an equitable claim,

2

the Court must rule on SPI's UCL claim.

The UCL's coverage is "sweeping, embracing anything that can properly be called a business practice and that at the same time is forbidden by law." *Ibid*. (citation omitted). The breadth of the UCL is well documented. *See e.g., Kasky v. Nike Inc.*, 27 Cal.4th 939, 949 (2002) ("The UCL's scope is broad"). "By proscribing any unlawful business practice, *section 17200 borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable*." *Cel-Tech Communications*, 20 Cal. 4th at 180. (emphasis added) (citation omitted). As set forth below, it is well established that violating FDA and EPA regulations are a basis to hold defendant liable for a violation of the UCL [*Infra*., Section IV]. Thus, Vestagen's violations of FDA and EPA regulations constitute both unlawful and unfair business practices in violation of the UCL.

## III.   SPI SUFFERED INJURY IN FACT CAUSED BY VESTAGEN'S ACTIONS.

SPI and Vestagen are direct competitors. "The UCL's purpose is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services." *Kasky*, 27 Cal.4th at 949. For any plaintiff, including a competitor, to bring a UCL claim, the plaintiff must show an injury in fact. "Under federal law, injury in fact is an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Kwikset Corp. v. Superior Court* 51 Cal. 4th 310, 322 (2011). "Injury-in-fact is not Mount Everest. Rather it suffices for federal standing purposes to allege some specific identifiable trifle of injury." *Id*. at 324 (citation omitted).

California courts have confirmed that a plaintiff need not seek restitution to have standing under the UCL. "We thus rejected in *Clayworth* the argument that if the plaintiffs could demonstrate no compensable losses or entitlement to restitution under section 17203, they would lack standing under section 17204." *Kwikset* at 336. The court in *Kwikset* explained that standing under the UCL could not be tied to restitution because "[i]njunctions are the primary form of relief available under the UCL to protect consumers from unfair business practices, while restitution is a type of ancillary relief." *Id*. at 337. SPI seeks injunctive relief – the primary form of relief under the UCL. Thus, "ineligibility for

3

restitution is not a basis for denying standing under section 17204." *Ibid*.

Federal courts have also recognized that restitution is not a requirement for standing under the UCL. In *Allergan, Inc. v. Athena Cosmetics, Inc*., 640 F.3d 1377, 1379 (Fed. Cir. 2011) the district court held that Allergan had failed to plead "an injury that was eligible for restitution." The Federal Circuit reversed. The Federal Circuit held that Allergan only needed to allege "economic injury that was the result of an unfair business practice." *Id*. at 1382. The Federal Circuit held that Allergan's allegations that it "lost sales, revenue, market share, and asset value . . . sufficiently alleges an injury that was caused by the defendants' unfair business practices." *Id*. The Federal Circuit thus held that Allergan had standing. *Id*.

At trial, SPI put into evidence that it had suffered the same types of injury that the Federal Circuit in *Allergan* found sufficient for a plaintiff to have standing under the UCL. On cross-examination, Vestagen's counsel asked Mike Singer of SPI why he believed SPI lost Baptist Health as a customer. Mr. Singer responded:

> Answer: "Well, we believe it's partly because Vestagen made claims about their product on their website, in their advertising, in their marketing, in their sales presentations, that are claims that they know, we know, and everyone who's doing antimicrobial technology should know that they're not supposed to be making."
>
> (Tr. Tran. at 323:13-17, at Ex. A to Declaration of Robert Estrin ("Estrin Decl.")).

Mike Singer's unrebutted testimony shows that SPI lost sales, revenue, and market share to Vestagen. This alone suffices for injury in fact and provides SPI with standing under the UCL. Additionally, Mike Singer testified that Vestagen's unlawful business practices impacted the goodwill and/or reputation of SPI:

> Question: "Mr. Singer, has the advertisement by Vestagen of the public health claims that they made regarding their scrubs had an impact on the goodwill or reputation of Strategic Partners?"
>
> Answer: "Yes it does." (Ex. A to Estrin Decl. at 320:22-25).

Mike Singer's testimony shows SPI suffered injury in fact and has standing under the UCL.

The evidence also established causation. "[W]hile a plaintiff must allege that the

4

defendant's misrepresentations were an immediate cause of the injury-causing conduct, the plaintiff is not required to allege that those misrepresentations were the sole of even the decisive cause of the injury-producing conduct." *Schramm v. JPMorgan Chase Bank, N.A.*, 2013 WL 7869336 at *6 (C.D. Cal. Oct. 2, 2013). In addition to Mike Singer's testimony, Baptist Health's Chief Nursing Officer, Diane Raines. admitted several times that Vestagen's claims about the ability of its VESTEX scrubs to protect the hospital setting and workers was a ***key factor*** in Baptist Health's decision to exclusively purchase from Vestagen.  For example:

Question: "If Vestagen scrubs, if you did not believe them to contribute to hospital workers' safety ***would you have purchased Vestagen scrubs for the hospital***?"

Answer: "***No***."  (Ex. B to Estrin Decl. at 36:21-25 played at trial).

Thus, Baptist Health relied on Vestagen's statements about VESTEX's ability to provide a safe hospital environment in deciding to purchase the product.  Since Baptist Health workers previously bought SPI products, it has been established that Vestagen's violations of FDA and EPA regulations caused SPI injury.  Thus, SPI has proven causation.

## IV.   A VIOLATION OF FDA OR EPA REGULATIONS CONSTITUTES A VIOLATION OF THE UCL.

As set forth below, SPI set forth undisputed evidence at trial that Vestagen violated FDA and EPA regulations.  Controlling precedent establishes violating FDA and EPA regulations constitutes a basis for a UCL claim.  In *In re Ferrero Litig.*, 794 F.Supp.2d 1107, 1116 (S.D. Cal. 2011) the plaintiff brought a UCL cause of action based on the "unlawful prong" of the UCL because defendant violated, among other laws, the Federal Food, Drug, and Cosmetic Act ("FDCA")[2].  "[T]he Court cannot conclude as a matter of law that Ferrero has not violated the FDCA or the Sherman Law.  Accordingly, ***Plaintiffs can rely on these statutes in bringing their claim under the unlawful prong of the UCL***, and the Court declines to dismiss this claim."  *Id*. at 1116-1117. (emphasis added).

---

[2] The FDCA gives the FDA "the responsibility to protect the public health . . . and the FDA has promulgated regulations pursuant to this authority." *Ivie v. Kraft Foods Global, Inc*., 961 F.Supp.2d 1033, 1037 (N.D. Cal. 2013).

In *Sandoval v. PharmaCase US, Inc*., 145 F.Supp.3d 986, 990 (S.D. Cal. 2015), plaintiff brought a cause of action under the UCL alleging that defendant's product IntenseX improperly implied the product would enable intense sex.   Defendant moved to dismiss Plaintiff's claim of a UCL violation.   The court denied defendant's motion finding that "Plaintiff's theories that the IntenseX labeling violates FDA regulations, the Sherman Law, and the unlawful prong of the UCL survive Defendant's challenges." *Id*. at 998.   *See also Krommenhock v. Post Foods, LLC*, 2017 WL 2378029 *7 (N.D. Cal. June 1, 2017), (denying motion to dismiss a claim under the UCL because plaintiff alleged that defendant unlawfully labelled "products in violation of the FAL, the CLRA, the FDCA, and the Sherman Law.")

Finally, in *Tracton v. Viva Labs, Inc.*, 2017 WL 4125053 (S.D. Cal. Sep. 18, 2017) plaintiff brought claims alleging false advertising due to mislabeling of coconut oil.   The court denied defendant's motion to dismiss reasoning in part that defendant failed to recognize the distinction between plaintiff's misrepresentation claim and its UCL claim based on the unlawful prong of the UCL. *Tracton* at *6.   "However, Plaintiff relies on these ***alleged FDA violations to support her claim under the UCL's unlawful prong** – a separate theory from her misrepresentation claims.*" *Ibid.*   (emphasis added).   The court held that Plaintiff could maintain its UCL claim under the unlawful prong because it alleged sufficient facts that the coconut oil was misbranded under "three separate FDA regulations." *Ibid*.

The above precedent holds that a violation of FDA or EPA regulations supports a finding of liability under the UCL as an unlawful or unfair business practice.   Thus, Vestagen's violation of FDA and EPA regulations necessitate a judgment against Vestagen on the UCL claim.   As shown below, SPI proved Vestagen committed such violations.

## V.   VESTAGEN VIOLATED SEVERAL FDA AND EPA REGULATIONS.

At trial, SPI proved that Vestagen violated both FDA and EPA regulations.   Either of these violations *on their own* could serve as the basis for SPI's UCL claim.

### A.   Vestagen Admitted That It Knowingly Violated FDA Regulations.

According to several FDA regulations, Vestagen could not market its VESTEX antimicrobial properties without first receiving 510(k) clearance from the FDA.   The

6

1   evidence at trial is undisputed that Vestagen has never received 510(k) clearance.  The fact

2   that Vestagen made claims about its VESTEX scrubs without first obtaining 510(k)

3   clearance is a clear violation *21 CFR 807.100(a)(5)* and *21 U.S.C.A Section 352*.

4        21 U.S.C.A. Section 352 sets forth that a drug or device is misbranded in violation of

5   the statute if its labeling is false or misleading in any particular manner.  (RFJN at Ex. 3).  21

6   CFR 807.100(a)(5) requires an applicant, Vestagen, to wait until the FDA provides Class II

7   (aka 510(k)) clearance before the applicant can proceed to market the "device" as providing

8   any health benefits.  (RFJN at Ex. 4).  Marketing VESTEX as if it had received 510(k)

9   clearance amounts to improper labeling in violation of both regulations.  Finally, *21 CFR*

10  *807.87(g)* requires that Vestagen needed to obtain 510(k) clearance before marketing

11  VESTEX as it did.  (RFJN at Ex. 5).  FDA guidance on this regulation states that the "FDA

12  believes that the addition of an antimicrobial agent to a legally marketed medical device

13  generally represents a significant modification that, in accordance with 21 CFR 807.87(g),

14  *requires a new 510(k) submission*."  (RFJN at Ex. 6).  By making claims Vestagen could

15  not legally make without 510(k) clearance, Vestagen misbranded its VESTEX product in

16  violation of 21 CFR 807.87(g), 21 CFR 807.100(a)(5), and 21 U.S.C.A. § 352.

17       Trial Exhibit 24 is an internal Vestex Claims Script which shows that Vestagen knew

18  that without 510(k) clearance it was prohibited from making public health claims about its

19  product. (Tr. Ex. 24).  The Claims Script is an internal document created by Vestagen to

20  identify what claims may be made prior to and after 510(k) clearance.  At the top of the

21  Claims Script, Vestagen wrote that "[a]ttributes to human health or a pathogen *MAY NOT*

22  be used until FDA has cleared VESTEX through its 510k/Pre-Market Notification Process

23  Filing." (Tr. Ex. 24-1).  As admitted to by Mr. Favret:

24       Question: "Do you understand that to mean that in the columns that right now prior to

25       510 approval – prior to a Class II approval, that Vestagen can make claims about its

26       garments based on Columns 1, 2, and 3 *but not 4*?"

27       Answer: "Correct."  (Ex. A to Estrin Decl. at 117:20-24).

28  Mr. Favret went on to testify that to make the claims in column 4 related to human health or

7

pathogens, Vestagen needed Class II clearance with the FDA, which it never received:

Question: "But do you understand that the 510 pre-K market notification – in other words, to make human health claims about pathogens, you must have Class II clearance."

Answer: "Correct." . . .

Question: "Okay.  Is it correct, sir, that Vestagen has never received a Class II clearance."

Answer: "We're in process currently."  (*Id.* at 118:13-16 and 118:21-23); and

Question: "And as of today, *you have still not received [Class II] clearance from the FDA; isn't that true, sir*?

Answer: *Not yet.  We're very close*.  (*Id.* at 466:14-17).

Incredibly, despite knowing what Vestagen can and cannot say to conform with FDA regulations, Mr. Favret admitted that Vestagen violated FDA regulations:

Question: "But *you cannot say*, until you receive clearance from the FDA, claims that VESTEX kills 99.99 percent of MRSA.  Do you see that?"

 Answer: "Correct."

Question: "And despite the fact that Vestagen has never received clearance, *Vestagen in its advertisement and on its website makes the claims that its product kills 99.99 percent of MRSA, correct*?"

 Answer: "*We do*."  (*Id.* at 119:23-120:6).

Mr. Favret's testimony unequivocally shows Vestagen knew what it could not say according to FDA regulations but said it anyway, thus violating FDA regulations.

Not only does Mr. Favret's testimony show a violation of FDA regulations, but so does Vestagen's advertising.  Vestagen's website stated "[i]n a published study in the Journal of Infection Control and Hospital Epidemiology, researchers reported a statistically *significant MRSA reduction of more than 99.99%* on the VESTEX scrubs compared to standard uniforms."  (Tr. Ex. 248-4).  Vestagen made similar statements in violation of FDA regulations in other advertising.  (*See e.g*., Tr. Exs. 246-2 and 332-4).  Vestagen's marketing

8

of its VESTEX product without first obtaining 510(k) clearance violated at least FDA regulations 21 CFR 807.87(g), 21 CFR 807.100(a)(5), and 21 U.S.C.A. Section 352.

### B.    Vestagen Admitted That It Knowingly Violated EPA Regulations

Vestagen's advertising violated EPA regulations as well, specifically the "Treated Article Exemption" found in *40 CFR 152.25(a)*.  (RFJN at Ex. 7).  EPA PR Notice 2000-1 explains the Treated Articles Exemption by addressing the types of claims that are not permitted for antimicrobial pesticide products, including VESTEX.  (RFJN at Ex. 8).  PR Notice 2000-1 explains that if "products have made public health claims that extend beyond the protection of the article itself . . . they do not qualify for the treated articles exemption." PR Notice 2000-1 continues on to say that the EPA considers an article to make a public health claim if advertising makes a claim of "antibacterial" or "that the product will beneficially impact or affect public health by pesticidal means at the site of use or in the environment in which applied."  Thus, pursuant to 40 CFR 152.25(a) and PR Notice 2000-1, Vestagen could not make public health claims about its Vestex fabric.

Vestagen's internal documents establish that it *knowingly violated* EPA regulations. On March 19, 2014, Amber Mitchell, Vestagen's VP of Regulatory Affairs, sent an internal memorandum citing the EPA's Treated Articles Exemption.  (Tr. Ex. 103).    The memorandum instructed Vestagen to limit any claims about its VESTEX fabric to the "product's antimicrobial properties as they relate to the protection of the article (fabric) itself.  Claims cannot be made for '*control of specific microorganisms*' or that the fabric acts as a 'disinfectant,' an 'antibacterial,' or 'prevents the spread of allergens.'  These claims *imply specific public health claims against human pathogens and as such the treated articles exemption would not apply*."  (Tr. Ex. 103).

Despite Ms. Mitchell's warning, Vestagen's advertising violated 40 CFR 152.25(a). With Mr. Favret on the stand, SPI's counsel introduced into evidence a press release in which Vestagen stated "Company develops new technology designed to help *combat hospital-acquired infections*.  Debut product line aims to fight MRSA and other killer bugs."  (Tr. Ex. 293).  Another Vestagen press release (Tr. Ex. 299) made public health

claims by stating that VESTEX plays a role in decreasing the risk of MRSA transmission to patients.  Press releases are considered advertisements "if it is likely to influence consumers in their commercial decisions."  *Kasky*, 27 Cal.4th at 968.

Additionally, Mr. Favret admitted at trial that Vestagen had improperly made public health claims in advertising VESTEX:

Question:  Were you aware, sir, that Vestagen had agreed to modify its advertisement?

Answer:  I would agree that there was – I was aware of a process.

Question:  To modify its advertisement, correct?

Answer:  Correct.

Question:  ***To remove public health claims*** that Strategic Partners has objected to, correct?  (Overruled objection omitted).

Question:  Is it your understanding?

Answer:  ***That was my understanding***.  (Ex. A to Estrin Decl. at 470:14-24).

In addition to Vestagen's press releases and Mr. Favret's testimony, Vestagen's own website contains statements that violate 40 CFR 152.25(a).  Vestagen's website contains multiple statements that its antimicrobial technology is "effective against a broad spectrum of organisms."  (Tr. Ex. 332-3).  That is a health and antibacterial claim that PR Notice 2000-1 identifies as a violation of 40 CFR 152.25(a).

## VI.   CONCLUSION

For the foregoing reasons, SPI respectfully requests an order that Vestagen has violated the UCL and for an injunction as described in the accompanying proposed order.

DATED: October 4, 2017

**MICHELMAN & ROBINSON, LLP**

By: */s/ Mona Z. Hanna*
    Mona Z. Hanna
    Attorney for Plaintiff and
    Counterclaim Defendant STRATEGIC
    PARTNERS, INC.