1          **UNITED STATES DISTRICT COURT**

2    **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

3      **HONORABLE R. GARY KLAUSNER, U.S. DISTRICT JUDGE**

4                 **- - - -**

5

6 **STRATEGIC PARTNERS, INC.,**       )

7                 **PLAINTIFF,**   )

       **vs.**             ) **CASE NO.**

8                            ) **CV 16-5900-RGK**

   **VESTAGEN PROTECTIVE TECHNOLOGIES, INC.,** )

9              **DEFENDANT.**   )

10 **VESTAGEN PROTECTIVE TECHNOLOGIES, INC.,** )

                              )

11           **COUNTER-CLAIMANT,**  )

                              )

12       **vs.**             )

   **STRATEGIC PARTNERS, INC.,**      )

13                        )

           **COUNTER-DEFENDANT.**   )

14

15

16      **REPORTER'S TRANSCRIPT OF JURY TRIAL**

17     **DAY 2, VOLUME 1; PAGES 184 TO 299**

18      **WEDNESDAY, SEPTEMBER 20, 2017**

19           **8:37 A.M.**

20        **LOS ANGELES, CALIFORNIA**

21

22     _____

23      **SANDRA MacNEIL, CSR 9013, RPR, CRR, RMR**
        **Official Reporter, U.S. District Court**

24          **255 East Temple Street**
           **Los Angeles, CA  90012**

25           **213.894.5949**

1  **APPEARANCES OF COUNSEL:**

2

3  **FOR PLAINTIFF/COUNTER-DEFENDANT STRATEGIC PARTNERS, INC.:**

4      MICHELMAN & ROBINSON, LLP
       BY:  MONA Z. HANNA, ATTORNEY AT LAW
5      17901 VON KARMAN AVENUE, SUITE 1000
       IRVINE, CALIFORNIA  92614
6      714.557.7990

7      MICHELMAN & ROBINSON, LLP
       BY:  SETH E. DARMSTADTER, ATTORNEY AT LAW
8      200 SOUTH WACKER DRIVE, SUITE 2900
       CHICAGO, ILLINOIS  60606
9      312.638.5671

10

   **FOR DEFENDANT/COUNTER-CLAIMANT VESTAGEN PROTECTIVE**
11 **TECHNOLOGIES, INC.:**

12     ERICKSEN ARBUTHNOT
       BY:  SHARON L. HIGHTOWER, ATTORNEY AT LAW
13     152 NORTH THIRD STREET, SUITE 700
       SAN JOSE, CALIFORNIA  95112
14     408.286.0880

15     OGLETREE, DEAKINS, NASH, SMOAK & STEWART, PC
       BY:  VINCE M. VERDE, ATTORNEY AT LAW
16          SEAN PAISAN, ATTORNEY AT LAW
       695 TOWN CENTER DRIVE
17     PARK TOWER, SUITE 1500
       COSTA MESA, CALIFORNIA  92626
18     714.800.7900

19

20 ALSO PRESENT:

21     MIKE SINGER

22     BEN FAVRET

23

24

25

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1                                *I N D E X*

2

3

4   *PLAINTIFF'S WITNESSES:*                              *PAGE*

5   *STEVEN LESLIE ROTH*

6      DIRECT EXAMINATION BY MR. DARMSTADTER            189

7      CROSS-EXAMINATION BY MS. HIGHTOWER               218

8      REDIRECT EXAMINATION BY MR. DARMSTADTER          237

9      RECROSS-EXAMINATION BY MS. HIGHTOWER             241

10
    *DAVID JOSEPH WEINER*
11
       DIRECT EXAMINATION BY MS. HANNA                  243
12
       CROSS-EXAMINATION BY MS. HIGHTOWER               262
13
       REDIRECT EXAMINATION BY MS. HANNA                274
14

15  *MICHAEL LAURENCE SINGER*

16     DIRECT EXAMINATION BY MS. HANNA                  276

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

*E X H I B I T S*

| TRIAL EXHIBIT NUMBER: | MARKED FOR I.D. PAGE: | RECEIVED IN EVIDENCE PAGE: |
|---|---|---|
| 210-6 | 250 | -- |
| 211-6 | 253 | -- |
| 347-6 | 260 | -- |
| 527-1 | -- | 288 |
| 527-2 | -- | 288 |
| 544 | -- | 292 |
| 545 | -- | 291 |
| 548 | -- | 295 |
| 764-28 | 257 | -- |

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1          LOS ANGELES, CALIFORNIA; WEDNESDAY, SEPTEMBER 20, 2017

 2                          8:37 A.M.

 3                          – – – –

 4

 5      (In the presence of the jury:)

 6          THE COURT:  Okay.  The record will reflect that all

 7   the members of the jury are in their jury box.

 8          Again, try to be punctual, because we have so much time

 9   allotted for this case.  If we start late, and we're already

10   going to lose probably a half hour today, and I'll talk about

11   that later, but then we get into other cases, which will drive

12   this out.  So if you start coming in late, the case is going to

13   drag out a lot farther than we want to.  So make an effort to

14   be in, like I said yesterday, 8:15.  That way, you won't have

15   any problem starting right at 8:30.

16          Counsel --

17          Oh, and by the way, like I said, probably lose that last

18   half hour today, so we might be cutting you loose at 3:30

19   rather than 4:00 o'clock, and I'll let you know as soon as I

20   find out.

21          Counsel, do you want to call your first witness?

22          MR. DARMSTADTER:  Good morning, Your Honor.  Thank

23   you.

24          Strategic Partners calls Steve Roth.

25          THE CLERK:  Right here to be sworn, please.  Raise
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   your right hand.

 2        Do you solemnly swear the testimony that you are about to

 3   give in the matter now before the Court shall be the truth, the

 4   whole truth, and nothing but the truth, so help you God?

 5             THE WITNESS:  I do.

 6             THE CLERK:  Thank you.  You may be seated.

 7             THE WITNESS:  Thank you.

 8             THE CLERK:  I'm sorry, up --

 9             THE WITNESS:  Okay.

10             THE CLERK:  May I please ask that you state your full

11   name for the record and spell your last name.

12             THE WITNESS:  My name is Steven Leslie Roth.  That's

13   R-o-t-h.

14             THE COURT:  Counsel, you may inquire.

15                       STEVEN LESLIE ROTH,

16                  having been first duly sworn,

17                     testified as follows:

18                     DIRECT EXAMINATION

19   BY MR. DARMSTADTER:

20   Q.   Good morning, Mr. Roth.  Thank you for being here today.

21        Can you please explain the reason why you're here to

22   testify today, Mr. Roth.

23   A.   Yes.  I'm here to testify about consumer perceptions

24   related to certain advertising on behalf of Vestagen for VESTEX

25   fabrics.  Based -- my opinions are based upon a survey that I
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    collaborated upon and the results of that survey, which I

2    analyzed.

3    Q.    And you mentioned that you collaborated in creating a

4    survey.  What do you mean by that, Mr. Roth?

5    A.    What I mean is that I worked with Renata Ritcheson, who is

6    a marketing research professional at Strategic Partners, Inc.

7    Q.    Why did you work with Miss Ritcheson on a survey,

8    Mr. Roth?

9    A.    We collaborated much the way I've collaborated over my

10   career with marketing research professionals and clients.  We

11   don't work in a vacuum.  We work together to produce the best

12   possible research project so that we can understand what the

13   results will be based upon the purpose of the study.

14   Q.    So you've done this type of collaboration before?

15   A.    I have.  I've worked with many companies over nearly 50

16   years of being in the marketing research and consulting

17   profession.  I've worked with Nike, American Express, Colegate,

18   Pepsi, Johnson & Johnson, among others, and it's very

19   commonplace to work with clients so that we get a better

20   understanding of what the purpose of the research is and what

21   questions to ask so that we may get the proper perspective of

22   what consumer perceptions are, what they understand and take

23   away from advertising.

24   Q.    Thank you.

25         And before we get to your survey, Mr. Roth, and then

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   ultimately to any opinions you may have formed, I'd like to

2   discuss your qualifications to create, conduct and analyze

3   surveys about consumer perceptions of advertising.

4       Could you briefly describe your educational background to

5   the ladies and gentlemen of the jury.

6   A.   Sure.  I have a bachelor of science in economics from the

7   Wharton School of Business at the University of Pennsylvania,

8   and a master's in business administration from the Stern

9   Graduate School of Business at New York University.

10  Q.   While you were in graduate school, were you employed?

11  A.   Yes.  Between the two years of my graduate school

12  education, I worked for the Gallup Organization.  You may be

13  familiar with that name because the Gallup Organization was at

14  one time the organization that conducted the Gallup Poll.

15  Q.   After graduating from business school, Mr. Roth, did you

16  begin working within the greater advertising industry?

17  A.   Yes, I did.  I began working for a small boutique

18  marketing research and consulting firm.

19  Q.   Specifically as it relates to your professional background

20  related to consurveys -- excuse me, consumer survey research,

21  can you please talk about your experience in that area?

22  A.   Certainly.  Over the years, I've conducted countless

23  surveys.  I don't keep track of them, but certainly well over a

24  thousand surveys.  Those surveys have been designed to help

25  under -- help companies understand consumer perceptions,

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    attitudes and behavior.  Why they buy certain things, why they
 2    don't, what they think of advertising.  In particular, what
 3    they think of advertising, because advertising is a key part of
 4    companies' marketing.  And so I've conducted many, many surveys
 5    to help understand what consumers' perceptions are of
 6    advertising so that the advertisers, the companies, can make
 7    use of that information in order to make better decisions about
 8    what to say and how to say it to consumers.
 9    Q.   How long have you been conducting consumer surveys of
10    their perceptions of advertising?
11    A.   Nearly 50 years.
12    Q.   Do you currently work in market research?
13    A.   Yes, I do.
14    Q.   What do you currently do?
15    A.   I have a company of my own.  It's Steve Roth & Company,
16    Limited, and that company advises and consults with clients
17    about issues related to their business, often involving survey
18    research, to help them understand how consumers feel and how
19    they behave, again, with an emphasis often on advertising.
20    Q.   What types of clients have you represented since you've
21    been with Steve Roth & Company?
22    A.   Over the years, I've represented Nike, Starbucks,
23    Johnson & Johnson, Colegate-Palmolive.
24    Q.   Are you part of any professional organizations relevant to
25    your work regarding consumer surveys and consumer perceptions
```

```
 1   of advertising?
 2   A.   Yes.  Almost since the beginning of my career, I've
 3   belonged to the American Marketing Association, which is a
 4   professional organization that is involved in furthering the
 5   profession of marketing and advertising, and I have served in
 6   the past on two committees of the Advertising Research
 7   Foundation:  One, the technical advisory committee about
 8   standards; the other, the brand equity committee to understand
 9   branding and the importance of branding for the Advertising
10   Research Foundation, which -- whose mission is to further the
11   profession of advertising and advertising research.
12   Q.   And how about academia?  Do you have any experience
13   working with academia in your professional career?
14   A.   Yes.  I've given guest lectures at the University of
15   Pennsylvania Wharton School of Business, the school from which
16   I graduated, and I have served on the board of advisors to the
17   marketing department of the University of Pennsylvania Wharton
18   School of Business.
19   Q.   Mr. Roth, have you previously been accepted as an expert
20   witness in the area of consumer perceptions of advertising in
21   courts of this country?
22   A.   Yes, I have.
23   Q.   Have you ever been proposed as an expert witness but had
24   your testimony excluded by a court?
25   A.   No.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Q.   Have you ever had one of your surveys excluded by a court?

2   A.   No.

3   Q.   And during the past, if my math is right, about 49 years

4   in this advertising industry, have you ever had anybody -- have

5   you ever heard anybody suggest that a press release is not a

6   form of advertising?

7   A.   Press release is a form of advertising.  It's marketing

8   communication that promotes the particular business or product.

9   Q.   Mr. Roth, prior to reaching any opinions in this case, was

10  a consumer survey conducted?

11  A.   Yes, it was.

12  Q.   Can you please explain to the ladies and gentlemen of the

13  jury what a consumer survey is.

14  A.   A consumer survey -- I'm sure most of you have either

15  taken surveys or seen them quoted in various ways.  A consumer

16  survey is a list of questions that are relevant to a particular

17  purpose, that are administered to a sample of people who are

18  prospective buyers, users or purchase influencers of a product

19  or service.  So questions are asked that are relevant to

20  determining what people think who might buy, use or influence

21  the purchase of a particular product.

22  Q.   And after they give their opinions, what happens next?

23  A.   The opinions of individuals are then tabulated into a form

24  in which they can be analyzed, and the results are then

25  reported upon so that you can form opinions and conclusions to

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    guide companies with respect to actions they might take based

2    upon the information.

3    Q.   Thank you.

4         And just to get this out of the way, are you here today on

5    behalf of Strategic Partners?

6    A.   Yes, I am.

7    Q.   Are you being paid for your testimony today?

8    A.   Yes.

9    Q.   How much are you being paid for your testimony today?

10   A.   I'm being paid $750 an hour on the stand for my testimony.

11   Q.   The consumer survey that was conducted in this case,

12   Mr. Roth, did it have a purpose?

13   A.   Yes, it did.

14   Q.   What was the purpose of the survey?

15   A.   The purpose was to understand consumer perceptions.  That

16   is, what message did the Vestagen advertising communicate to

17   healthcare workers who wear scrubs?  What message did they take

18   away from it, what were their perceptions, what did they

19   believe based upon what they had read?

20   Q.   Once you determined the purpose of the survey in this

21   matter, Mr. Roth, what did you do next?

22   A.   The next step was to design the study.  And in designing a

23   study, there are really three things that are quite important.

24   Basically, who, what and how many.

25   Q.   So let's unpack that a little bit, Mr. Roth.  When you say

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   "who," what are you referring to?
 2   A.   "Who" is, who are the relevant people that you want to
 3   talk to.  Who are the people who are users, purchasers and
 4   purchase influencers.  For --
 5   Q.   And -- sorry, go ahead.  I didn't mean to cut you off.
 6   A.   Okay.  For example, in this case, we interviewed
 7   healthcare workers who wear scrubs.  There are a lot of
 8   healthcare workers who don't wear scrubs.  But it's important,
 9   because the advertising talks about this scrub product, that we
10   interview people who wear scrubs.  Similarly, these are
11   consumers.  These are users.
12        If we wanted, for example, to find out about presweetened
13   cereal, we could talk to moms, but we probably would rather
14   talk to the children, because the children are the ones who eat
15   the product, and they're the ones who consume it, and they're
16   the ones who influence the purchase of the product by asking
17   their moms and dads to purchase the product, and so they would
18   be a relevant audience for that type of question.
19   Q.   Thank you.
20        The next thing after the "who," you said, is the "what."
21   What is the "what"?
22   A.   The "what" is, is fashioning questions to get information
23   that is relevant to the purpose.  So if we want to know what
24   people think about the advertising, what the advertising means
25   to them, we have to ask questions that relate to that issue.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| 1 | So we formulate a series of questions that relate to what they |
| 2 | think about the advertising. |
| 3 | Q.   Lastly, you said "how many."  What does that mean? |
| 4 | A.   "How many" is the sample size.  Sample size of one is |
| 5 | obviously too small.  Sample size of a hundred million is |
| 6 | obviously too costly and unnecessary.  In most studies of this |
| 7 | type, a sample size of 300 is certainly sufficient to provide a |
| 8 | statistically sound base for analysis. |
| 9 | Q.   And in this case, you actually surveyed approximately 301 |
| 10 | people, correct? |
| 11 | A.   Yes, we surveyed 301 people.  The ending sample was 282. |
| 12 | Q.   Why was that? |
| 13 | A.   There were 19 people who were unable to access the |
| 14 | stimulus, and so we did not follow up -- we did not allow them |
| 15 | to complete the questionnaire.  We did not use any of their |
| 16 | responses as far as what their understanding of the advertising |
| 17 | was. |
| 18 | Q.   And just so it's clear to everybody, Mr. Roth, anybody who |
| 19 | is not able to successfully complete the entire survey, you |
| 20 | excluded any of the answers they gave from your results, |
| 21 | correct? |
| 22 | A.   Yes.  There were additional people who completed a part of |
| 23 | the study but not the whole study.  So we only included people |
| 24 | in our analysis who completed the entire study. |
| 25 | Q.   I know we're all eager to get to your survey, but I have a |

```
 1   couple more technical questions to ask you.

 2        How were the survey respondents selected?  Did you go

 3   knock on doors and ask people if they were healthcare workers

 4   who wear scrubs?

 5   A.   I might have done that in 1967 when I was working for the

 6   Gallup Organization, but no, we did not do that.  Technology

 7   has advanced a lot, and certainly that would be inefficient,

 8   because healthcare workers are only a portion of workers in the

 9   United States, so we'd have to knock on a lot of doors to find

10   them.

11        We used a very well-known, very well-respected leading

12   firm in the industry, called Survey Sampling, in order to

13   provide us with a list of healthcare workers whom we could

14   contact to survey.

15   Q.   And I want to get back a little bit to your collaboration

16   with Miss Ritcheson.  Was it you or Miss Ritcheson who worked

17   with Survey Sampling International to get that sample of

18   people?

19   A.   It was Miss Ritcheson who did that.  That's an

20   administrative task, and clearly she was capable of doing that.

21   Q.   And once you had received a pool of potential respondents

22   from Survey Sample -- Survey Sampling International -- could we

23   call it "SSI" for short?

24   A.   That's what -- that's really what it's known as mostly in

25   the industry.  Sure.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Q.    I'm just trying to make it easier for me, to be honest.

2         So once we had SSI give you a list of respondents, how did

3   those people take the survey?  Did they come into a room and

4   you ask them questions?

5   A.    That's one way of doing a survey, but no, because these

6   people were geographically distributed all over the

7   United States, so to invite them to come someplace would be

8   very inefficient and very costly.  They took the survey online

9   via computer, much the way you would take a college entrance

10  SAT exam or a driver's test at a motor vehicles bureau.  The

11  questions were posed in front of them, and as the questions

12  came up, they clicked on the appropriate answers for them and

13  then moved on to the next question.

14  Q.    Did you utilize a company in order to provide that survey

15  online to people?

16  A.    Yes.  We used a company called SurveyGizmo, Incorporated.

17  SurveyGizmo, again, is a company that provides this service to

18  many marketing research organizations and companies that want

19  to do surveys.

20  Q.    And in your industry, in the market research industry, is

21  using SurveyGizmo and using SSI an industry-accepted and common

22  practice?

23  A.    It's common practice to -- certainly to use SSI, and it's

24  common practice to use organizations such as SurveyGizmo to

25  conduct surveys, because those are not capabilities that most

1  marketing research firms have internally.

2  Q.   Thank you.

3       I'd like to go about figuring out how you learned how

4  healthcare workers who wear scrubs viewed certain Vestagen

5  advertising.  I'm going to unpack -- help you unpack it.  We'll

6  take it step by step.

7       What is the first step that occurs?

8  A.   Well, the first step that occurs, once we've -- once we've

9  identified them and once we have the questionnaire and once

10 they've taken the survey -- in order for them to take the

11 survey, they have to qualify to enter the survey, so we ask

12 them a series of questions that we call "screening questions."

13 Q.   Before we get to screening questions, I just want to get

14 to the creation of the questions in general, if that's okay.

15      Who wrote the first draft of the stimuli or the questions

16 that the respondents encountered with SurveyGizmo?

17 A.   The first draft was written by Renata Ritcheson.  And I

18 looked and reviewed that, made suggestions, comments, and those

19 suggestions and comments were accepted and incorporated into

20 the final draft, which I reviewed before it was administered to

21 the sample.

22 Q.   Ultimately, before any questions were shown to any

23 consumers, did you approve all of them?

24 A.   Yes, I did.

25 Q.   The final stimuli, the final questionnaire, would you

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    consider that, ultimately, your work product?

 2    A.   It is, because I approved it.

 3    Q.   And again, that's something you've done before,

 4    collaborating on the creation of a stimuli?

 5    A.   Certainly.  But -- certainly.

 6    Q.   And that's an accepted practice in your industry?

 7    A.   It is an accepted practice in our industry.

 8    Q.   It doesn't affect your ability to analyze the results?

 9    A.   No.

10    Q.   Mr. Roth, I'm going to ask you to look at an exhibit.

11    It's Exhibit 206.

12    A.   It's kind of blurry on the screen.  I'll put my glasses

13    on.  Maybe it'll help.

14         I see it, yes.

15    Q.   Are you able to see that now?

16    A.   Yes, I am.

17              THE COURT:  Has this been admitted, Counsel?

18              MR. DARMSTADTER:  Yes, Your Honor, this has previously

19    been admitted.

20              THE COURT:  You're correct.  I have it down here.

21    Okay.

22    BY MR. DARMSTADTER:

23    Q.   Do you recognize Exhibit 206, Mr. Roth?

24    A.   I do recognize it, yes.

25    Q.   What do you recognize it to be?
```

```
1    A.    I recognize it to be a paper copy of the questionnaire
2    that was administered to respondents online, with certain
3    differences.
4    Q.    So this is the questionnaire that was created in
5    collaboration with Miss Ritcheson?
6    A.    That's correct.
7    Q.    The one that you ultimately approved?
8    A.    Correct.
9    Q.    The one that you testified was your work product?
10   A.    Yes.
11   Q.    And you just said that there was a difference between this
12   document and what was seen by the respondents; is that right?
13   A.    Certainly.
14   Q.    Can you tell us what the difference is?
15   A.    Well, for example, certainly at the top where it says,
16   "Survey, SPI versus Vestagen lawsuit," that was not included in
17   what respondents saw, that -- this is an exhibit.  This is
18   not -- that's not what they saw.  Nor did they see anything on
19   the bottom that says, I guess, Exhibit 206 dash -- dash 1.
20   They saw the questions.  They also didn't see things like
21   "thank and terminate," because those things popped up on the
22   screen.  Those are instructions for the computer programmer.
23   So --
24   Q.    Thank you.
25         I want to walk through this questionnaire.  I want to
```

```
1   start with the first six questions, if that would be okay.

2   A.   Sure.

3   Q.   Is it possible to blow those up, the first six questions?

4        Are you able to see those clearly?

5   A.   That's much better.

6   Q.   What are the first -- how would you categorize the first

7   six questions of this questionnaire, Mr. Roth?

8   A.   The first six questions are what we call screening

9   questions.

10  Q.   What are screening questions?

11  A.   Screening questions are questions that are designed to

12  ensure that people who belong in the study that we want to

13  interview because they are prospective buyers, purchasers, they

14  are users and/or purchase influencers, will be in the study,

15  and the people who are not qualified, and therefore not

16  relevant to the advertising, are not interviewed.

17  Q.   Well, I thought you relied on SSI to get the qualified

18  people to answer the survey.

19  A.   Well, this is a kind of quality check.  They may provide

20  us with healthcare workers, but they may not know all the

21  qualifications, nor -- nor can -- nor do we want to be

22  accepting just of those qualifications.  We want to have a

23  second quality control check.  You know, it's kind of like

24  wearing belt and suspenders to make sure that your pants stay

25  up.  The -- this is a quality control step.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Q.   And ultimately, you'd use these six questions to screen

2   out any people who wouldn't be appropriate respondents to the

3   study?

4   A.   Sure.  What if the list is in some way not perfect and

5   there -- some of the people are not healthcare workers?  We

6   don't want to talk to them.  What if they're healthcare workers

7   but they don't wear scrubs, or don't wear scrubs frequently

8   enough?  We don't want to talk to them.  We want to talk to the

9   people who are relevant to using the product, having experience

10  with the product, and possibly purchasing and certainly

11  influencing the purchasing of the product.

12  Q.   So once you made sure you had an appropriate audience with

13  Questions 1 through 6, what came next?

14  A.   Next, we instructed respondents that they were going to

15  see a stimulus, and showed them some advertising that appeared

16  on Vestagen website.

17  Q.   Did you personally verify the accuracy of the language

18  that was contained in the stimuli, that it came from Vestagen's

19  website, before showing it to the respondents?

20  A.   No, I did not.  I relied on Renata Ritcheson to assure me

21  of that, and I'm confident that she did.

22  Q.   After the respondents saw the language that you showed to

23  them about Vestagen products, what happened next?

24  A.   They were asked a series of questions to get at their

25  perceptions of what the advertising meant to them.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Q.    Is there a difference, Mr. Roth, in the survey industry,

2   between open-ended and closed-ended questions?

3   A.    Yes.   There were two types of questions that were asked.

4   Open-end questions are questions that ask respondents to

5   volunteer response in their own words.   There is no "Yes,"

6   "No," "Agree," "Disagree."   They're simply asked to volunteer

7   in their own words, for example, what the advertising said to

8   them, what benefits it communicated to them.

9   Q.    And if you look at your screen, you'll see that Question 7

10  and 8 are right in front of you.   Do you see those?

11  A.    Yes, I do.

12  Q.    Is that what you would categorize as open-ended questions?

13  A.    Yes.

14  Q.    And which were the closed-ended questions in the survey?

15  A.    Well, the first six questions, which were screening

16  questions, were all closed-end questions.   Closed-end questions

17  are ones that have choices, "Yes," "No," and the kind of work

18  you do, et cetera.   And in addition to that, Questions 9

19  through 12 in the questionnaire, the ones that also looked at

20  what people thought about the advertising, are closed-end

21  questions, because they provide respondents with a choice of

22  their answers.   Those choices include "don't know."   And one of

23  the reasons we include "don't know" is because we instruct

24  people not to guess, and we don't want them to guess, and we

25  tell them if they don't know the answers, they can say "don't

```
 1    know."
 2    Q.   Mr. Roth, it's important, in order to get results that you
 3    feel comfortable relying on, that the respondents aren't
 4    guessing, correct?
 5    A.   Absolutely.
 6    Q.   And so earlier you talked about wearing both a belt and
 7    suspenders to keep on your pants, right?
 8    A.   Yes.
 9    Q.   And this seems like a similar situation to that.  You put
10    on the belt -- right? -- which was an instruction in the
11    questionnaire not to guess?
12    A.   Yes.
13    Q.   And then the suspenders were the option to say "I don't
14    know"?
15    A.   Correct.
16    Q.   I want to go through Questions 9 through 11 to understand
17    why they're included in the survey.
18         What was the reason for asking Question No. 9?
19    A.   Question 9 is what we call a "filter question."  It was
20    asked so that we could qualify people about -- in order to --
21    in order to determine whether they should be asked Question 10.
22    Q.   So Question 9 reads, "Based only on what you read about
23    VESTEX, does VESTEX provide protection?"  You see that?
24    A.   Yes, I do.
25         If people answered yes, VESTEX provides protection, they
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    would be asked Question 10.  If they said no, it does not

2    provide protection, or I really don't know, then they would

3    skip to Question 11.

4    Q.   Thank you.

5         How about Question 10?  Let's look at that.  Question 10

6    says, "Based only on what you read about VESTEX, which of the

7    following, if any, would be protected by VESTEX?  Select all

8    that apply."  Do you see that?

9    A.   I do.  And --

10   Q.   And do you see next to it, where it says "randomize"?

11   A.   Yes.

12   Q.   That's not something that the respondents would have seen,

13   right?

14   A.   No.  That's an instruction for the programmer.  What that

15   means is that the answers did not appear in that same order for

16   every single respondent.  The answers were rotated to avoid a

17   kind of positional bias.

18   Q.   Thank you.

19        And what was the reason for asking Question No. 10?

20   A.   The reason for asking Question No. 10 was to determine

21   what kinds of protection, if any, that respondents believed the

22   Vestagen VESTEX fabrics provided.

23   Q.   And now let's look at Question 11.  Question 11 asks a

24   series of questions.  What is the purpose of them?

25   A.   And here, the purpose of this question is to understand --

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    and again, if you look at the wording of the question, it says,

2    "Based only on what you read about VESTEX."  Based upon only

3    what they've read about VESTEX, what benefits did they feel

4    the advertising communicated to them about the product?  And

5    again, does it deliver the benefit or doesn't it deliver the

6    benefit, or don't you know?  So again, they had the choice of

7    an affirmative, it delivers, or it doesn't deliver, or they

8    could have said "I don't know."  And this included 16 different

9    possible benefits.

10   Q.   So, Mr. Roth, again, this says "randomized statement."  So

11   again, you randomize these 16 statements so people would view

12   them in different orders?

13   A.   Yes.  The purpose of that is to minimize any kind of bias

14   that might occur.  Because the first benefit they saw was when

15   they said, "Oh, it has that one; therefore, all of the others

16   must be true."  So by randomizing them, we avoid that type of

17   potential bias, not that we know that there is bias.

18   Q.   And Mr. Roth, in addition to randomizing the questions,

19   you also included an option of saying "I don't know," correct?

20   A.   Yes, we did.

21   Q.   And I'm sorry I'm going to have to get a little bit

22   technical again, but it's my understanding that there are 16

23   different claims mentioned in Question 11; isn't that right?

24   A.   Yes.

25   Q.   And only 14 of the 16 claims that are mentioned in

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Question 11 that were presented to all of the respondents

2    reflect direct or indirect claims made by Vestagen on its

3    website; isn't that right?

4    A.    Yes.

5    Q.    Two of the claims in Question 11 contain language that

6    were not on Vestagen's website, correct?

7    A.    Yes, that's correct.

8    Q.    And that would be A and B, correct?

9    A.    Yes.  The two claims that are not included in the Vestagen

10   advertising that we exposed consumers to are "Helps with odor

11   control" and "Helps reduce fabric degradation."

12   Q.    All right.  And they weren't necessarily next to one

13   another when the respondents saw them, they were randomized

14   just like all the others?

15   A.    Yes.

16   Q.    I don't understand.  Why, Mr. Roth, would you include

17   claims -- if you're trying to figure out what people thought of

18   Vestagen's claims, why would you include two claims that

19   Vestagen didn't make?

20   A.    We included those claims as what we might call a

21   "control."  They're reference points for comparative purposes.

22   They allow us to more accurately gauge what consumers are

23   thinking about and are saying about the advertising.

24   Q.    Can you explain a little bit more about what a control

25   is, so the rest of us, who aren't survey experts, can

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   understand?
 2   A.    Sure.  A control is kind of like a placebo in a drug test,
 3   where you kind of measure the effect of the drug by comparing
 4   it to the effects of the placebo.
 5   Q.    Thank you.
 6         We can take that down.
 7         In reviewing the results of the survey -- you did review
 8   the results of the survey, didn't you?
 9   A.    Yes, I did.
10   Q.    And when you reviewed the results of the survey, were you
11   able to determine how many of the people who took the survey
12   and completed it had heard of Vestagen prior to taking the
13   survey?
14   A.    Yes.  Only approximately 7 percent, actually a little less
15   than 7 percent of the sample, had heard of Vestagen before the
16   survey.
17   Q.    And does that matter?
18   A.    Yes, it matters a lot.
19   Q.    Why?
20   A.    It matters because what we're looking for are opinions
21   about the advertising and what the advertising says to them.
22   And to the degree that they might have had knowledge about
23   Vestagen, they might have had preconceptions, but because
24   almost all of them didn't know anything about Vestagen and
25   hadn't heard about it, anything that they said in the survey
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    reflects their opinions based upon the stimulus that they were

2    shown rather than their preconceptions that they may have had

3    about the company.

4    Q.   Mr. Roth, based upon your education, knowledge, experience

5    in the market research profession, and in particular your

6    experience over nearly 50 years of creating and analyzing

7    consumer surveys, do you stand by the construction of this

8    survey document?

9    A.   Yes, I do.

10   Q.   Mr. Roth, applying your education, experience, knowledge

11   and training as an advertising professional who has analyzed

12   hundreds, if not thousands, of consumer surveys, were you able

13   to review the results of this survey and form opinions?

14   A.   Yes.

15   Q.   I'd like to go through your opinions of what the survey

16   found, Mr. Roth, and I'd like to direct you to what has been

17   previously marked as Exhibit 204.

18           MS. HIGHTOWER:  Objection, Your Honor.

19           THE COURT:  Grounds?

20           MS. HIGHTOWER:  The Court instructions on expert

21   testimony.

22           THE COURT:  I don't know -- I don't know what the

23   question's going to be.  I haven't heard what the question is

24   going to be.

25           MS. HIGHTOWER:  Pursuant to your instructions, they
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   were to be done hypothetically.

2           THE COURT:  Well, that's correct, but I don't know

3   what the question's going to be.

4       Obviously, you can't give your opinion on what may or may

5   not have happened in this case or whether or not these are

6   deceptive or whether or not someone was influenced.  All you

7   can do is testify to hypotheticals:  If this were true,

8   hypothetically, what would be the result of it.  And then it's

9   up to counsel to prove the underlying facts to be true or not

10  to be true.

11          THE WITNESS:  Understand.

12          THE COURT:  Okay?

13          MR. DARMSTADTER:  Your Honor, the witness understands

14  and so do I.  I would just like to show him Exhibit 204, if

15  possible.

16          THE COURT:  I haven't sustained the objection.  You

17  may show it to him.

18          MR. DARMSTADTER:  Thank you.

19          THE COURT:  But I just want to make sure, that's an

20  issue for the jury to decide, whether or not these facts were

21  proved and whether or not it influenced in this particular

22  case.  Experts can come in and give their opinion as to, based

23  on these facts, what their opinion of the results would be, but

24  it's up to you to determine whether or not those are the

25  results or not.  Okay?  That's a jury determination.

```
 1          Go ahead, Counsel.

 2   BY MR. DARMSTADTER:

 3   Q.    Do you have the Exhibit 204 in front of you?

 4   A.    No.  I have a blank screen.

 5          THE CLERK:  Which binder?

 6          MR. DARMSTADTER:  Yeah, it's black binder number 2.

 7   Thank you.

 8          THE WITNESS:  Okay.  Thank you.  Excuse me.

 9          Yes, I see this document.

10   BY MR. DARMSTADTER:

11   Q.    Do you recognize Exhibit No. 204?

12   A.    Yes, I do.

13   Q.    What is it?

14   A.    That's the expert report that I prepared.

15   Q.    Did you create that in collaboration with Renata

16   Ritcheson?

17   A.    No.  This is my report.  I reviewed the findings, I

18   analyzed the findings independently, and I prepared my own

19   conclusions.  And I read Miss Ritcheson's report, but the words

20   and the conclusions here are my own.  The opinions are my own.

21   Nobody altered or edited those words in any way.

22   Q.    Mr. Roth, based on your knowledge, experience and

23   education related to surveys, and based on your experience

24   analyzing hundreds of consumer surveys, were you able to

25   understand what the data of the survey showed?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    A.   Yes, I think so.

2    Q.   Did the data of the survey -- what did the data of the

3    survey show?

4    A.   The data showed, for example, that 85 percent of consumers

5    believed that the Vestagen VESTEX fabric provided protection

6    for the wearer.

7    Q.   How relevant is the number 85 percent?

8         THE COURT:  Let me just clarify this because of the

9    objection that was made.

10        What you're saying is, they indicated on the survey they

11   believed.  That's far different than saying they did believe,

12   but what you're saying is, they indicated on the survey they

13   believed; is that correct?

14        THE WITNESS:  That's correct.

15        THE COURT:  Okay.

16        THE WITNESS:  I'm speaking to the results of the

17   survey.

18        THE COURT:  Excuse me.  Excuse me.

19        Next question.

20        MR. DARMSTADTER:  Thank you, Your Honor.

21   Q.   Within the survey industry, is a number of 85 percent

22   relevant?

23   A.   Eighty-five is remarkably high and certainly relevant, but

24   even if the number were as low as 15 to 20 percent in

25   circumstances such as these, it's substantive information as
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   far as how many consumers believe that particular thing.

2   Q.   Thank you.

3        So did the survey find anything specifically based upon

4   Question No. 10?

5   A.   Yes.  In addition to protection of the wearer, more than

6   55 percent said that, based upon what they read, the Vestagen

7   VESTEX product provided protection.  For the patient.

8   Q.   Thank you.

9        And now I want to ask you some questions about survey

10  Question No. 11 and its findings.

11  A.   Okay.

12  Q.   Specifically with regards to No. 11, did the survey have

13  any findings on those claims at issue?

14  A.   Yes, it did.

15  Q.   And what were those findings?  For example.

16  A.   Well, for example, about 88 percent of the respondents, if

17  I'm correct, said that they believe, based upon what they read

18  in the advertising that they saw, that Vestagen VESTEX product

19  reduced the risk of transmission of pathogens.  Eighty -- 88 or

20  89 percent said that based upon what they read in the

21  advertising, that they believed that Vestagen VESTEX fabrics

22  reduced the transmission of bacteria that cause

23  healthcare-acquired infections.  And --

24  Q.   Hold on.

25       Question No. 11 contained the controls, right?

1    A.    Yes.

2    Q.    Those were the two questions that weren't Vestagen claims,

3    right?

4    A.    That's correct.

5    Q.    And so just to be a hundred percent careful, it's possible

6    to subtract those answers from the results, isn't it?

7    A.    Sure.

8    Q.    If you were to subtract the answers from the results of

9    the non-Vestagen claims, the control questions, what would

10   happen?

11   A.    As I recall, those two claims were in the range of 50 to

12   57 percent, saying that they believe that the Vestagen product

13   provided those benefits.  So if you would subtract, say, the

14   average of 53 percent from the 89 percent, the 88 percent and

15   so on, you would get numbers in the range of about 35 percent.

16   Q.    And that's still higher than the 15 to 20 percent that you

17   said you consider meaningful in your industry?

18   A.    Certainly.

19   Q.    Mr. Roth --

20         Your Honor, we would move to admit Exhibit 204 into

21   evidence.

22              MS. HIGHTOWER:  Objection.

23              THE COURT:  Is that the entire report?

24              MR. DARMSTADTER:  Yes, Your Honor.

25              THE COURT:  Sustained.  He's testified to it.  The

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1     testimony stays in.

2              MR. DARMSTADTER:  Thank you, Your Honor.

3     Q.    Mr. Roth, I'm going to ask you a couple hypothetical

4     questions now.

5     A.    Sure.

6     Q.    You understand what a hypothetical question is?

7     A.    I do.

8     Q.    So, Mr. Roth, hypothetically, based on what you learned

9     from the results of this particular consumer survey that we

10    just discussed, combined with your knowledge, your skill, your

11    education and your experience in consumer research, if VESTEX

12    scrubs being sold by Vestagen had not been tested by a

13    scientific study, what would that mean?

14    A.    Hypothetically, it would mean to me that consumers were

15    being misled by the advertising.

16    Q.    And hypothetically, based upon the results of the consumer

17    survey that we just spent a lot of time discussing, combined

18    with your knowledge, skill, education and experience in

19    consumer research, if VESTEX scrubs do not actually provide the

20    benefit of protection from dangerous contaminants and a

21    reduction in the transmission of pathogens, would that have

22    meaning to you?

23    A.    Again, hypothetically, knowing what consumers told us they

24    believe the Vestagen advertising communicated to them, it would

25    mean to me that the advertising was misleading to consumers.

1    Q.   And finally, Mr. Roth, based upon the results of your

2    consumer survey that we just discussed, combined with your

3    knowledge, skill, education and experience in consumer

4    research, hypothetically, if VESTEX scrubs provided protection

5    only from certain bacteria and only from bacteria that came

6    directly in contact with the fabric, would that have meaning to

7    you?

8    A.   Again, speaking hypothetically but based upon the

9    information from the survey, based upon what respondents told

10   us the advertising communicated to them, that would indicate to

11   me that the advertising was misleading to consumers.

12   Q.   Thank you, Mr. Roth.

13        We have nothing further.

14            THE COURT:  Cross-examination.

15            MS. HIGHTOWER:  Yes, sir.

16                      **CROSS-EXAMINATION**

17   BY MS. HIGHTOWER:

18   Q.   Good morning, Mr. Roth.

19   A.   Good morning.

20   Q.   How are you today?

21   A.   Very well, thanks.  Yourself?

22   Q.   Just fine.

23        I have just a few questions for you that I'd like to

24   clarify.

25        When you were asked about your qualifications, if you

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   don't mind, have you had any specialized training or education

 2   in the area of false advertising or misrepresentation?

 3   A.   No, I haven't.

 4   Q.   Have you ever acted as an expert in other cases involving

 5   claims of misleading or false advertising?

 6   A.   Yes, I have.

 7   Q.   And has that been as to the Lanham Act?

 8   A.   Yes.

 9   Q.   Have you ever been an expert witness in cases involving

10   the California laws regarding misleading or false advertising?

11   A.   No, I have not.

12   Q.   You also talked about being qualified to testify in court

13   and on surveys, correct?

14   A.   Yes.

15   Q.   And when is the last time that you testified in court?

16   A.   2008.

17   Q.   And where was that?

18   A.   It was in Baltimore, Maryland.

19   Q.   All right.  Thank you.

20        Let's go to the beginning, when you were first contacted

21   about developing a survey.  And you were contacted by whom?

22   A.   I was contacted by Renata Ritcheson.

23   Q.   And were you told the purpose of the survey?

24   A.   I was told that the purpose of the study was, again, to

25   understand and assess the communication of certain advertising
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    by Vestagen.
2    Q.   All right.  And was it -- the survey was to be created for
3    purposes of the litigation, correct?
4    A.   Potentially, the survey would be used -- the results of
5    the survey would potentially be used in the context of
6    litigation, yes.
7    Q.   All right.  When you were contacted by Miss Ritcheson,
8    what did she tell you was the purpose of contacting you?
9    A.   The purpose was to engage me to provide advice, counsel
10   and input, to conduct, analyze and opine upon, give my opinions
11   upon, the results of a survey that we created.
12   Q.   Now, Miss Ritcheson is an employee of Strategic Partners,
13   correct?
14   A.   That's correct.
15   Q.   And was she to be your primary contact as far as the
16   survey was concerned?
17   A.   She was my -- she was my only contact with respect to the
18   collaboration that we did on the survey.
19   Q.   In preparing the survey, who was the person that
20   identified the type of respondents that were to be surveyed?
21   A.   This was again a collaboration.  Ms. Ritcheson proposed
22   that we speak to healthcare workers who wore scrubs as part of
23   their professional practice.  And understanding that healthcare
24   workers who wear scrubs are users of the product who may
25   purchase the product and who also may influence the purchase of
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    the product, that seemed appropriate, and I approved that.

2    Q.   Was there any discussion specifically as to -- and if I

3    understand correctly, you wanted users of the product, correct?

4    A.   That's correct.

5    Q.   Purchasers of the product, correct?

6    A.   Users, purchasers, correct.

7    Q.   Would this include any of the companies as purchasers that

8    would be providing scrubs for their employees?

9    A.   Only if they were users of the product.

10   Q.   Okay.  So someone, for example, a vice president of a

11   hospital group, you would not include into the survey if they

12   purchased the scrubs for their employees; is that correct?

13   A.   That's correct.

14   Q.   All right.  Now, you were talking about the sample size,

15   and who was it that suggested the sample size?

16   A.   Renata Ritcheson suggested the sample size.  It's a sample

17   size that I've used in other studies of this type and certainly

18   is very consistent with studies of this type, in this type of

19   work.

20   Q.   All right.  And I believe you testified that she contacted

21   SurveyGizmo.

22   A.   She contacted SurveyGizmo, yes.

23   Q.   Okay.  But the listing of participants was to be done by

24   Survey Sampling, SSI?

25   A.   That's correct.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.    All right.  And did she contact SSI to identify the type

2    of respondents that you wanted for the survey?

3    A.    She contacted SSI to provide the parameters of the

4    respondents, the kind of people that we wanted to speak to.

5    Q.    All right.  In developing the survey in and of itself, who

6    primarily prepared the questions?

7    A.    The first draft of the questions was prepared by

8    Ms. Ritcheson.  I reviewed that and made fair number of

9    comments and suggestions, all of which were -- or essentially

10   all of which were implemented in the final questionnaire.

11   Before the final questionnaire was administered to respondents,

12   I reviewed it and I approved it.  So she drafted the first

13   draft, but it was a collaborative work, and it wasn't

14   administered until my changes were implemented and approved.

15   Q.    Can you tell us a little bit about the changes you made to

16   her draft?

17   A.    Sure.  For example, one of the changes that we made was

18   that in Question 11, originally people were just asked to check

19   all of the ones -- all of those 16 benefits that would apply to

20   being provided by the VESTEX Vestagen fabric.  But I did not

21   feel that that was an appropriate question.  We wanted to give

22   them a chance to say it did or it didn't for each of the

23   individual benefits.

24         Another thing we did, of course, was to instruct them that

25   we didn't want them to guess, that we wanted them to say "don't

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    know" if they didn't know.

2        Another thing that I added was a randomization of the

3    benefits in Question 11, as I described before, to minimize any

4    kind of order bias.

5        And, you know, those -- those -- those were some of the

6    changes that I suggested.

7    Q.   All right.  Now, the survey, as I understand it, was based

8    on a stimulus, correct?  And then the survey questions?

9    A.   That's correct.

10   Q.   So the instructions were for the responding party to read

11   the stimulus and then ask these questions based on what they

12   learned in the stimulus, correct?

13   A.   Yes.

14   Q.   And who secured the -- who prepared the stimulus?

15   A.   Renata Ritcheson did.

16   Q.   And do you know where she got the information?

17   A.   She got the information from Vestagen website.

18   Q.   In reviewing the stimulus, did you make any changes to

19   that stimulus?

20   A.   Yes, I did.

21   Q.   And what changes?

22   A.   Originally, as she presented the stimulus to me, she did

23   not identify the company and the brand.  So originally it says

24   company X and brand Y, and I said that we are doing this on

25   behalf of understanding a company called Vestagen and fabrics

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    called VESTEX.   So we changed the brand X and brand Y to

2    Vestagen and VESTEX.

3    Q.    That was the extent of the changes you made?

4    A.    Those were the changes that I made.

5    Q.    Did you ever verify the accuracy of the stimulus yourself?

6    A.    I did not.  I relied upon Miss Ritcheson, and I'm

7    confident that what she presented me was accurate.

8    Q.    Is it important that a stimulus in which you're going to

9    be doing a survey should be verified by you to be correct?

10   A.    As far as I was concerned, I trusted Ms. Ritcheson that

11   the information was accurate.

12   Q.    Had you worked with Ms. Ritcheson before?

13   A.    No.

14   Q.    When Survey Sampling was contacted for participants for

15   the pool of responders to your survey, again, this was done by

16   Renata Ritcheson, correct?

17   A.    Yes, it was.

18   Q.    Did you review at any time the list of samplers that were

19   being provided?

20   A.    No, I did not.

21   Q.    Do you know how they were selected strictly for users or

22   purchasers?

23   A.    Again, I think they were selected on the basis of being

24   healthcare workers.

25   Q.    All right.  And based on the --

```
1   A.    Based upon their occupation.

2   Q.    Okay.  And going forward, these were parameters that had

3   been established by Renata, correct?

4   A.    That's correct.

5   Q.    And you've told us before, 300 participants you thought

6   was a fair survey, correct?

7   A.    Yes.

8   Q.    And before issuing the survey, when you're saying 300 is a

9   good pool of respondents, based on your experience, what is the

10  normal responding rate for a pool of 300?

11  A.    I'm not exactly sure what your question is.

12  Q.    All right.  Of all the surveys that you've conducted, can

13  you tell me, looking at what's going to be a pool of 300 people

14  to participate in a survey, what did you anticipate the

15  response amount to be?

16  A.    Response rate can vary tremendously based upon any survey

17  that you do.  I've seen survey responses as low as 10 percent;

18  I've seen survey responses as high as 90 percent.  So it is

19  something that is very hard to predict.

20  Q.    Do you know what the criteria was to select the

21  participants in the survey?

22  A.    Not specifically.

23  Q.    Would geographic residence be one of them?

24  A.    Yes, geographic residence was one of them.

25  Q.    Employment status, correct?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    A.    Employment stat- -- I can read you the six questions we

2    screened the respondents on to make sure that they were the

3    type of respondents that we felt were relevant as users of the

4    product.  That is to say that they wore scrubs as part of their

5    employment and therefore experienced the use of the scrubs.

6    And as consumers, it's important that they were users,

7    potential purchasers and potential influencers of purchases

8    being made by others.

9    Q.    All right.  And I'll ask you about your survey in a few

10   moments, but again, this was criteria that had been suggested

11   by Renata, correct?

12   A.    Suggest --

13   Q.    By Ms. Ritcheson.  Sorry.

14   A.    That's okay.

15   Q.    I apologize.

16   A.    Not to me.

17        The criteria was suggested, but they are criteria that I

18   approved of.

19   Q.    All right.  I'm going to ask that we go back to

20   Exhibit 206, which has been identified as the survey in SPI

21   versus Vestagen lawsuit, and ask that you look at the first

22   page with Questions 1 through 6.

23   A.    Okay.

24   Q.    All right?  Looking at Question 1, "Do you currently live

25   in the United States?  Yes or No."  Why was that an important
```

1   qualifier?

2   A.   It's an important qualifier because we felt that the --

3   that the scope of the users were domestic, in the

4   United States.

5   Q.   All right.  Then I'm going to ask you to go down to

6   Question 4.  There are four choices there:  Medical for humans;

7   dental/orthodontic; veterinary medicine; other.  And then in

8   bold --

9       Which I understand would not be on the survey in and of

10  itself, but are instructions, correct?

11  A.   That's correct.

12  Q.   -- it says "thank and terminate."

13  A.   Correct.

14  Q.   Were there other areas of healthcare that you believed

15  would not be relevant to this survey?

16  A.   Yes.  We -- no.  These were the areas we felt that were

17  relevant to healthcare workers who would wear scrubs.

18  Q.   What would you anticipate being part of the "other"

19  category?

20  A.   "Other" could be a receptionist.  "Other" could be an

21  accountant.  "Other" could be some backroom person not involved

22  in interacting with patients.

23  Q.   And those were determined not to be wearing scrubs; is

24  that correct?

25  A.   That's correct.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   Q.   All right.  Then going down to Question 5, there is --
 2   one, two, three, four -- I can count -- eight different
 3   categories.  Down to F, it says "Other, patient-treating
 4   professional."
 5        What type of profession or work would be incorporated in
 6   "Other, patient-treating professional"?
 7   A.   Somebody perhaps who would give an eye exam or something
 8   like that.
 9   Q.   And that category doesn't wear scrubs?
10   A.   Not to my knowledge.
11   Q.   And then it says "thank and terminate."  So what does that
12   mean?
13   A.   That means that somebody in that category would not be
14   interviewed.
15   Q.   All right.  If you go down to the next one, which is 5G,
16   it says "administrative."
17        Now, it's my understanding, looking at your survey, that
18   if they chose administrative, that you would thank and
19   terminate them from the survey.
20   A.   That's correct.
21   Q.   Would this include administrations that purchased scrubs
22   for their employees?
23   A.   Well, all of these -- all of the people on the list are
24   supposed to be healthcare workers.  So the answer to that is --
25   the answer to that is, that if they're healthcare workers in an
```

1    administrative position, they would not -- they would not be

2    interviewed, because we're only interested in people who are

3    wearing scrubs as users.

4    Q.   Okay.  But you also indicated that part of the

5    qualifications would be purchasers, correct?

6    A.   Yes, but as I -- as I -- as I spoke before, we felt that

7    it was relevant to speak to the users of the product, much the

8    way you would speak to people who use presweetened cereal in

9    order to determine their influence on purchase as well as -- as

10   well as their actual consumption experience.  They are the

11   people who would be influenced by the advertising.

12   Q.   Okay.  So if I understand correctly, the administrative

13   arm which may be purchasers of garments from Vestagen or the

14   VESTEX documents would be more like the parents as opposed to

15   their employees that you would characterize as the child in

16   your example?

17   A.   Yes, that's -- that's -- that's a proper analogy.

18   Q.   And then you have H, "Other, non-patient treating

19   professional."  Does this go back to the receptionist?

20   A.   Yes.

21   Q.   All right.  And so out of those three categories, "Other,

22   patient-treating professional," "administrative," and "Other,

23   non-patient treating professional" -- "non-patient treating

24   professional," sorry, you would eliminate all of these people

25   from the survey?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.    That's correct.

 2    Q.    All right.  Now, do you have any figures so that you would

 3    know how many people were terminated, thanked and terminated

 4    from each one of these categories on your qualifying questions?

 5    A.    That information is available.  I don't have it right at

 6    hand.

 7    Q.    Okay.  So right now you can't tell us?

 8    A.    I can tell you that information was provided, I know, to

 9    counsel, but I can't -- I can't tell you the exact numbers.

10    But there was -- there are records of people who were

11    terminated at each one of the questions.

12    Q.    When you first consulted with Ms. Ritcheson regarding

13    conducting a survey, did you inquire as to whether or not she

14    had done any previous surveys regarding Vestagen?

15    A.    No, I did not.

16    Q.    Would that be important to know when you were doing your

17    survey?

18    A.    Not really.  We spoke about the specific purpose of this

19    study, and she identified herself as a marketing research

20    professional within the SPI organization.  So, from my

21    perspective, I wasn't aware of any previous work she did, nor

22    was I influenced by any work she might have done, because I

23    didn't know about it.

24    Q.    All right.  Now, once the survey had been prepared in its

25    final form, did you review that survey?
```

1   A.   I did not review the actual survey that was -- that was

2   administered online.  I reviewed the final, if you will,

3   electronic copy or paper-and-pencil copy of the questionnaire.

4   Q.   So let me understand.  Once it had been put online for the

5   respondents that had been specifically identified by you and

6   Renata, you did not see the survey itself online, correct?

7   A.   That's correct.  I saw -- I saw it before it was put

8   online, but not when it was online.

9   Q.   All right.  Once it was put online, it was to be conducted

10  for what period of time?

11  A.   The field period was to go as long as necessary in order

12  to obtain 300 respondents.

13  Q.   All right.  Were there specific instructions with the

14  survey when it was put online as to what time period the survey

15  would be online for people to respond?

16  A.   I don't recall.

17  Q.   Would it refresh your recollection that it was to be over

18  a two-day period, from June 30th through July 1st?

19  A.   It refreshes my memory that that is the actual field

20  period, but I don't recall whether there were instructions that

21  it only take place during those two days.

22  Q.   All right.  And would July 1st -- did you approve the

23  dates that the survey would be administered?

24  A.   Yes, I did.

25  Q.   All right.  And did you take into account that that was a

```
 1   holiday weekend?

 2   A.   No, I did not take into account that it was a holiday

 3   weekend.

 4   Q.   Now, once the survey had been conducted, did you -- I'm

 5   sorry, strike that.

 6        Who did the tabulations?

 7   A.   Tabulations were done by SurveyGizmo.

 8   Q.   All right.  And did you review those tabulations?

 9   A.   I reviewed those tabulations, yes.

10   Q.   And did you verify those tabulations in any way?

11   A.   I did not go through every single number in the

12   tabulations.  I reviewed and spot-checked numbers that I felt

13   were important to verify for me that the results were correctly

14   tabulated.

15   Q.   All right.  Once the tabulations were done, what happened

16   to the survey at that point in time?

17   A.   At that point in time, I reviewed the results as they were

18   tabulated and prepared my own independent analysis and

19   conclusions based upon those results, which were input into my

20   expert report, which also I reviewed after my own report.

21   After my own analysis and my own conclusions, I read the report

22   that was drafted by Ms. Ritcheson, and my conclusions largely

23   were consistent with hers.  And what I did was present again

24   input to that report, so that the final product reflected our

25   collaborative input in terms of what respondents took away.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    There were some things that I made more clear and some things

2    that I added to the report to make sure that it properly

3    communicated what respondents felt about the advertising.

4    Q.   Mr. Roth, excuse me, but my question, and maybe I wasn't

5    clear, was that the tabulations that had been prepared as a

6    result of the survey, who were those sent to?

7    A.   The tabulations were initially sent to Ms. Ritcheson, who

8    passed them on to me.

9    Q.   All right.  And there was -- you mentioned that she had

10   done a report, correct?

11   A.   She did a draft report based upon the same tabulations

12   that I based my own report on.

13   Q.   Okay.  So with the ultimate end of the survey, are there

14   two reports?

15   A.   Well, ultimately there is an expert report which I

16   prepared.  There is a survey report which represents the

17   collaborative input of her draft and my input and review and

18   suggestions which were implemented to that report.

19   Q.   But Ms. Ritcheson prepared the survey research report for

20   SPI versus Vestagen?

21   A.   Is there an exhibit number for that?

22   Q.   Pardon?

23   A.   Is there an exhibit number that I can refer to so I make

24   sure that I get that correct?

25            THE COURT:  No, if you --

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1          MS. HIGHTOWER:  No, I just want it based on your

2    knowledge.  Sorry.

3          THE COURT:  If you don't know, you can always say "I

4    don't know."

5          THE WITNESS:  No, no, I -- okay.  That report is

6    separate from my report, and yes, I believe that she prepared

7    the initial draft of that report.

8    BY MS. HIGHTOWER:

9    Q.   All right.  Thank you.

10         Now, when you reviewed her draft report, can you tell me

11   what input you provided to make any changes?

12   A.   Yes.  I wanted to make certain things clear.  One of the

13   things I wanted to make clear was the fact that for -- I

14   believe it was 13 of the 14 claims that were related to

15   Vestagen's advertising, more people said that Vestagen VESTEX

16   provided that benefit, or those benefits, than said that the

17   control provided -- control benefits were provided by Vestagen

18   or VESTEX.

19   Q.   Would it be fair to say that your input, the intent of

20   your input was to provide suggestions so that she could more

21   clearly communicate what she had said in her report?

22   A.   I would say that, again, it was a collaborative effort,

23   and so that it was a report that certainly reflected what I

24   would consider to be my input and my work product.  And so,

25   yes, it was designed to make it more clear.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.    All right.  Had you ever done any marketing in your career

2    to healthcare professionals?

3    A.    You know, I'm not exactly sure what you mean by

4    "marketing."  I've done marketing research for healthcare

5    professionals.

6    Q.    Okay.  Have you done marketing research for healthcare

7    professionals?

8    A.    I've done marketing research for -- that involve

9    healthcare professionals.  So, for example, I've -- I conducted

10   a survey for a major corporation in order to provide

11   substantiation to an advertising claim made globally in

12   approximately a hundred countries, interviewing dental

13   professionals, dentists, in more than 48 -- over a thousand

14   dentists in more than 48 countries around the world.  That's an

15   example of one.

16   Q.    Okay.  When you have a survey like this, is there a margin

17   of error?

18   A.    Yes, there's always a margin of statistical error.

19   Q.    All right.  And can you tell me what the margin of error

20   was in this survey?

21   A.    Approximately plus or minus 6 percentage points.  So, for

22   example, a number of 50 might be as high as 56, might be as low

23   as 44.

24   Q.    All right.  Would it be fair to say that a survey is not

25   always required to evaluate advertising?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.   I'm not sure I understand the question.

2    Q.   If I made the statement that a survey is not always

3    required to evaluate advertising, would that be correct?

4    A.   I would not agree with that statement, because I think

5    that it would have to be -- it has many nuances and

6    qualifications.

7         Let me explain.  One could speculate -- I mean, we all see

8    advertising, and we all look at advertising and say, "That's a

9    great ad," or "What a stupid ad that is."  We all can make

10   suppositions and speculations about advertising.  But without

11   knowing, without having information as to what a body of people

12   really think and take away from that advertising, it's purely

13   speculative.

14        I've done surveys in the past where I've been very

15   surprised by the findings, where my clients have been very

16   surprised by the findings, because they indicate something

17   other than what they've speculated or what they intended and

18   even what they hoped to find.  So I certainly don't think that

19   it's appropriate to speculate about whether or not certain

20   things are true about advertising without having the

21   information to support that.

22   Q.   Mr. Roth, do you -- in working with your clients, do you

23   always tell them that they should conduct a survey regarding

24   whatever product it is that they want to survey or they want to

25   do some advertising on?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   A.   No, because sometimes I recommend focus groups or in-depth

2   interviews which are more qualitative so that we can get more

3   detailed and in-depth qualitative information.

4        THE COURT:  She really didn't ask that question.  She

5   just asked the question did you or didn't you, and you said no,

6   and that's the answer to the question.

7       Next question.

8        MS. HIGHTOWER:  All right.  I have no other questions

9   at the present time.  Thank you very much.

10        THE WITNESS:  Thank you.

11        THE COURT:  All right.  Redirect.

12                    **REDIRECT EXAMINATION**

13   BY MR. DARMSTADTER:

14   Q.   Mr. Roth, is a survey a standard -- accepted industry

15   standard to obtain empirical data?

16   A.   Yes, it is.

17   Q.   We talked a little bit about a plus or minus 6 percent

18   margin of error.  Do you remember that?

19   A.   Yes.

20   Q.   Do you remember testifying earlier that in Question 11 you

21   had results of approximately 88 percent and 89 percent?

22   A.   That's correct.

23   Q.   And then you subtracted 53 percent for the controls.  Do

24   you remember that?

25   A.   I do.

```
 1   Q.   And you got a number in the mid to high 30s?

 2   A.   Yes.

 3   Q.   If you were to subtract 6 percent from those numbers in

 4   the mid to high 30s, wouldn't you still be above the 15 to

 5   20 percent that you consider significant?

 6   A.   Absolutely.

 7   Q.   Ms. Hightower asked you some questions about the two-day

 8   period when the survey was conducted being over a holiday

 9   weekend.  Do you recall that?

10   A.   I do.

11   Q.   Do you also recall she asked you some questions about the

12   number of respondents that were proposed to you by SSI?

13   A.   I'm not -- I'm not sure I understand that.  She didn't --

14   we didn't --

15   Q.   Let me ask the question differently.

16        The goal of this survey as far as the "how many" that we

17   discussed before, --

18   A.   Yes.

19   Q.   -- that was approximately 300?

20   A.   That's right.

21   Q.   And so it might have taken 300 people from SSI to get 300

22   respondents, right?

23   A.   Theoretically, that's possible, but of course it's not.

24   Not at all.  It's not at all feasible, no.

25   Q.   It might have taken 3,000 respondents from SSI to get to
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    300, right?
2    A.   Yes, sir.  It really depends on a couple of things.  It
3    depends on, for example, how accurate their lists were.  That's
4    why we ask those additional screening questions, because if
5    their list was a hundred percent accurate, we might need fewer
6    people.  If it was 50 percent accurate, we might need more
7    people.
8    Q.   Either way, Mr. Roth, you would have kept the survey open
9    as long as it took to get approximately 300 qualified
10   responses; isn't that right?
11   A.   Yes.
12   Q.   You wouldn't have closed it in two days just because there
13   were going to be fireworks on the 4th of July, would ya?
14   A.   No.
15   Q.   You talked a little bit earlier about sugar cereals.  Do
16   you remember that?
17   A.   Yes.
18   Q.   And you said that you -- if you were going to do a survey
19   about sugar cereals, you'd want to survey kids, because those
20   are the ones who eat the sugar cereals, right?
21   A.   Sure.
22   Q.   And as the people who eat sugar cereals, they're consumers
23   of sugar cereals.
24   A.   They are consumers of sugar cereals.  They can tell you
25   whether they like Froot Loops better than, I don't know, Sugar
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Pops or some other cereal, and they can tell you what they

2   liked and what they didn't like and what they think of

3   advertising and what they don't think of advertising about

4   those products.

5   Q.   And whether or not those kids are actually swiping a

6   credit card at the grocery store to buy the cereal, they're

7   influencing the purchasing decisions; isn't that right?

8   A.   For sure their parents, their dads and moms who make the

9   purchases are influenced by what their kids ask for.

10  Q.   And you're drawing an analogy to that with people who wear

11  scrubs for work; isn't that right?

12  A.   That -- that certainly is one analogy, yes.  You

13  know, I've worked for Nike.  I could give you other analogies

14  as well based upon, you know, the shoes that kids wear and what

15  they may ask their parents to buy for them.

16  Q.   Either way, Mr. Roth, I think the point of the analogy,

17  can we agree, is that the people who actually utilize a product

18  either purchase the product themselves or have some level of

19  influence over purchasing decisions?

20  A.   I certainly agree with that.

21  Q.   Then at this point, Mr. Roth, I would thank you and

22  terminate you.

23  A.   Terminate me?  Please don't terminate me.

24          THE COURT:  I have no idea what that means.  Are you

25  through with your direct?  Or redirect?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              MR. DARMSTADTER:  Yes, I am, Your Honor.

 2              THE COURT:  Recross.

 3              MS. HIGHTOWER:  A short recross.

 4                     RECROSS-EXAMINATION

 5   BY MS. HIGHTOWER:

 6   Q.   Mr. Roth, I don't want to belabor the point in any way,

 7   but you just indicated, in response to a question, that it

 8   would be important to survey those that influence the purchase

 9   of certain products, such as the children influencing their

10   parents to buy the sugar cereal, right?

11   A.   Yes.

12   Q.   So I will ask you again.  Is there any reason to doubt

13   that the administration of a healthcare facility that purchases

14   scrubs for their employees would not be that person that

15   influences purchasers?

16   A.   No, there's no reason to doubt that they would be -- that

17   they would possibly influence purchasers, but again, they're

18   not the users of the product who ultimately experience the

19   product and are influenced by the advertising that is aimed at

20   them.

21   Q.   So are you telling me, then, that it's not important to

22   survey those that may influence purchasers?  Such as in your

23   child/parent sugar cereal type of scenario, would it be better

24   to include the parents in a survey that you were doing?

25              MR. DARMSTADTER:  Objection, Your Honor, misstates
```

1    testimony.

2            THE COURT:  Overruled.

3    BY MS. HIGHTOWER:

4    Q.   Go ahead.

5    A.   It -- it certainly would be something that could be done.

6    Would it -- how valuable it would be and whether it's necessary

7    or not, it depends on the situation.

8            MS. HIGHTOWER:  All right.  Thank you very much,

9    Mr. Roth.

10           THE COURT:  Okay.  You may step down.

11        May this witness be excused?

12           MR. DARMSTADTER:  Yes, Your Honor.

13           THE COURT:  Counsel, any objection to the witness

14   being excused?

15           MS. HIGHTOWER:  No, sir, that's fine.

16           THE COURT:  Thank you very much.  Thank you for coming

17   in.

18        Next witness.

19           MS. HANNA:  Your Honor, we'd like to call David

20   Weiner.

21           THE CLERK:  Mr. Weiner, right here to be sworn,

22   please.  That's fine.  Please raise your right hand.

23        Do you solemnly swear the testimony that you are about to

24   give in the matter now before the Court shall be the truth, the

25   whole truth, and nothing but the truth, so help you God?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1              THE WITNESS:  I do.

2              THE CLERK:  Thank you.  You may be seated.

3          May I please ask that you state your full name for the

4     record and spell your last name.

5              THE WITNESS:  David Joseph Weiner, W-e-i-n-e-r.

6              THE COURT:  Okay.  Counsel, you may inquire.

7              MS. HANNA:  Thank you.

8                        DAVID JOSEPH WEINER,

9                   having been first duly sworn,

10                     testified as follows:

11                      DIRECT EXAMINATION

12    BY MS. HANNA:

13    Q.   Good morning, Mr. Weiner.

14    A.   Good morning.

15    Q.   Mr. Weiner, what is your occupation, sir?

16    A.   I am a forensic accountant, forensic economist for VWM

17    Analytics.

18    Q.   And are you here in your capacity as a retained expert for

19    Strategic Partners?

20    A.   Yes, I am.

21    Q.   Can you please describe for the jury a little bit about

22    your education and background in economics.

23    A.   Sure.  I have a bachelor of science degree from Berkeley,

24    University of California at Berkeley.  I was in the Haas

25    business school there, and within that school they have various
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   disciplines.  Mine were economic analysis and policy and

2   marketing.  I also have an MBA, a master's in business

3   administration from the Wharton School, which is at the

4   University of Pennsylvania.  And I'm accredited with the

5   American Society of Appraisers in business appraisals.

6        I've been doing this sort of work for about 30 years.  Two

7   years at Deloitte Touche, one of the large accounting firms.  I

8   was a management consultant with them.  Worked for nine years

9   at a firm called Brinton Economics.  Had my own firm for seven

10  years, called West Coast Economics, and then merged that into

11  the current firm back in 2004, VWM Analytics.

12  Q.   Are you a member of any professional societies or

13  associations?

14  A.   Yes.  The American Society of Appraisers, the Institute of

15  Business Appraisers, the National Association of Forensic

16  Economists, National Association of Business Economics,

17  Certified Fraud Examiners.

18  Q.   Sir, have you qualified in the past to testify as an

19  expert in the area of economics prior to today?

20  A.   Yes.

21  Q.   On how many occasions?

22  A.   I've testified in court about 600 times.

23  Q.   And sir, are you being reimbursed for your services as an

24  expert in this case?

25  A.   That is my fondest hope.  Yes.

1   Q.   Have you worked with me before this case?

2   A.   I have.

3   Q.   On how many occasions?

4   A.   I think maybe half a dozen times over the past decade.

5   Q.   Okay.  That's being kind, but I think it was more like --

6   more than a decade.  But have you worked -- you're familiar

7   with the attorneys on the other side and the law firms that

8   they're with?

9   A.   Yes.

10  Q.   Have you worked with them as well?  Have you been retained

11  by their law firms to act as an expert on behalf of their

12  clients?

13  A.   Yes, I have.

14          THE COURT:  Ladies and gentlemen, it's 10:00 o'clock,

15  so we're going to break at this particular time.

16  Fifteen-minute break.  Come on back in at 10:15.

17      Remember the admonishment not to discuss the case among

18  yourselves or with anybody else or form or express any opinions

19  about the matter until it's submitted to you and you retire to

20  the jury room.

21      If you'd leave quietly, I'm going to talk with the

22  attorneys a little bit before you --

23          THE CLERK:  All rise.

24          THE COURT:  You may step down, also.

25          THE WITNESS:  Thank you, Your Honor.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1        (Outside the presence of the jury:)

 2           THE COURT:  Okay.  And I'm going to ask the witness to

 3   leave the courtroom, also.  I want to talk to the attorneys

 4   just a little bit.

 5        (Witness David Weiner exited the courtroom.)

 6           THE COURT:  Okay.  You can have seats.

 7        The record will reflect that the jurors are out of the

 8   courtroom and the witness is out of the courtroom.

 9        Okay.  Not being critical, but just a heads-up so nobody

10   is blindsided on this.  The time that you have, I'm giving to

11   you all the time.  I told you that if it was really efficient

12   and effectively put on, I might give you a little bit more

13   time.  That's not the case.  I'm not being critical of that.

14   You choose where you want to put the time in.

15        This last witness, Mr. Roth, well over 50 percent, maybe

16   even 60, 75 percent, was more than just answering the question.

17   He rambled a lot, he went into explanations, he went into

18   examples that he was not asked for.  That's fine, I'm not being

19   critical.  If that helps your case, if you need that

20   surplusage, that's great.  You decide where you spend your

21   time on it.  But I just want to let you know that the time

22   frame of seven hours is probably pretty much set.  I don't see

23   myself coming off that.  And so I don't want to mislead

24   anybody.  I don't want anybody to be blindsided on it one way

25   or the other.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1          You do have the ability to control your witnesses.  If you
2   ask them a question -- many times in this last witness, you
3   asked a question that could have been answered "yes" or "no" or
4   in one or two sentences, and he went on for three or four
5   minutes, and sometimes the jury's kind of looking up at the
6   ceiling.  That's okay if it helps your case.  You are the
7   architects of your case.  You know your case better than I do.
8   You know what helps your case.  So I'm not being critical at
9   all, but I just want you to realize that the time limit of
10  seven hours at this time I think is still an appropriate
11  timing.
12         Okay.  Have a pleasant break, and we'll see you back in in
13  15 minutes.
14              THE CLERK:  All rise.
15         Court is in recess.
16         (Recess held from 10:03 a.m. to 10:20 a.m.)
17         (In the presence of the jury:)
18              THE COURT:  Okay.  The record will reflect that all
19  the members of the jury are in their respective seats in the
20  jury box and the witness is the witness stand.
21         Counsel, you may continue your direct.
22              MS. HANNA:  Thank you, Your Honor.
23  Q.   Mr. Weiner, before we took a short break, you were telling
24  us about your education and background and that you are here as
25  a retained expert; is that correct, sir?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   A.   Yes.

2   Q.   What was your assignment in this case?

3   A.   I was asked to assess the economic losses, assuming that

4   all the -- all the allegations here are true, and that if there

5   was false advertising and unfair competition by Vestagen.

6   Q.   And can you explain to us what was the process that you

7   undertook in analyzing or reaching -- I'm sorry, strike that.

8        Did you reach a conclusion with respect to the

9   assignment?

10  A.   I did, yes.

11  Q.   And could you please explain to the jury what process you

12  undertook in reaching that conclusion.

13  A.   Sure.  So it's not rocket science.  I mean, it's a bit

14  tedious sometimes, but really we're just looking at how much

15  money did Vestagen make as a result of their behavior.  Again,

16  I'm assuming all the allegations here are true.  And if that's

17  true, how much did they make that they shouldn't have made, or,

18  conversely, how much didn't, did not, SPI, Strategic Partners,

19  make because of Vestagen's behavior.  So on the Vestagen side,

20  we call that a disgorgement of profits, how much did they make

21  in profits that they should not have made, or how much did

22  Strategic Partners not make in profits, whether they lost

23  profits, as a result of Vestagen's behavior.

24  Q.   And what documents did you review in looking at those

25  issues?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.    So I was given a lot of documents.  Many of those pieces

2    of information were not helpful to me.  I mean, I've got tens

3    of thousands of spreadsheets on Excel and legal pleadings.

4    Ultimately, I looked at the financial statements, such as they

5    were, of Vestagen, and, separately, of Strategic Partners, and

6    that includes in some cases profit and loss statements and

7    balance sheets, and in some cases unit sales and the costs of

8    those sales, pieces of information that would allow me to look

9    at revenues and profits.

10   Q.    Thank you.

11         And did you prepare a report which included your

12   conclusions?

13   A.    I did.

14   Q.    I'd like you to turn in the binder number 2, the black

15   binder number 2, to Exhibit 210, please.

16   A.    Got it.

17   Q.    Is that a true and correct copy of one of the reports you

18   prepared in this case?

19   A.    Yes, it is.

20   Q.    And does it include your conclusions and calculations to

21   the assignment you described to the jury?

22   A.    Initial calculations, yes.

23   Q.    Okay.  In that report, can you please turn to 210-6.

24         Do you have that in front of you?

25   A.    Yes, I do.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Q.   Can you please explain or describe to the jury the

2   document that you are looking at.

3   A.   So this is a summary of Vestagen's revenues from 2010

4   through February of 2017.

5        MS. HANNA:  Your Honor, may we ask to submit 210-6

6   into evidence?

7        THE COURT:  210-6?

8        MS. HIGHTOWER:  Objection.

9        THE COURT:  Basis, Counsel?

10       MS. HIGHTOWER:  It's hearsay.

11       THE COURT:  Sustained.

12   He can testify to it.

13       MS. HANNA:  Can we publish it as demonstrative

14   evidence?

15       THE COURT:  Yeah, sure, as demonstrative evidence.

16       MS. HANNA:  Thank you.

17   Can you go ahead and put that up?

18   (Marked for identification, Exhibit 210-6.)

19   BY MS. HANNA:

20   Q.   All right.  We have that chart now on the monitors for the

21   jury.  We can try to blow that up so you can explain to us, if

22   you will, what does this chart reflect.

23   A.   So this comes right off of Vestagen's financial

24   statements.  This shows their revenue, also called income, and

25   it's broken out in different categories.  And you can see down

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   in the lower right-hand corner I've created a yellow box, which

2   is just a tally, a summation, of their revenue from 2011

3   through 2017, February.  Yeah, through February of 2017.

4   Q.   Were you assuming, based on these numbers, that all of the

5   revenue that Vestagen makes is from the VESTEX scrubs?

6   A.   Yes.

7   Q.   Okay.  Following your conclusion -- now, let me -- strike

8   that.

9        Is that the -- would you call that the gross profit?

10  A.   No.  I call it the gross revenue.

11  Q.   Okay.  After reaching this point, did you do any further

12  analysis with respect to the disgorgement of profits that you

13  were looking at?

14  A.   I did.

15  Q.   What did you do next?

16  A.   So what I have to do to get the disgorgement of profits,

17  because this is a revenue figure, is I have to figure out which

18  expenses are saved if those revenues were not made.  Right?

19  Because every time you sell a product, you have to produce that

20  product, and there are costs that go into the production of

21  that product.  So if you're making a top, manufacturing a scrub

22  top, obviously, you need fabric and the labor to make that top.

23  And if you had not made that top, then you save the expenses

24  that would have gone into making that.  So I need to subtract

25  from this number what is called, by Vestagen and most financial

```
 1   statements, costs of goods sold.
 2   Q.   And were you, subsequent to your report, provided with
 3   that information?
 4   A.   Yes.
 5   Q.   And how did you receive that information?
 6   A.   In some of the discovery that was sent to me, basically,
 7   from your office, I think.
 8   Q.   Okay.  I'd like you to turn to exhibit -- oh, actually,
 9   before I get to that, I'd like you to turn to Exhibit 211,
10   since you're in that binder.
11   A.   Yes.
12   Q.   Do you have that document in front of you?
13   A.   I do.
14   Q.   Can you please identify that for the record.
15   A.   So it looks like these are my notes that I produced at my
16   deposition.
17   Q.   What is the -- what do these notes reflect?
18   A.   So the top notes that are in handwriting were my comments
19   in response to the -- my counterpart on the other side.
20   They've retained an economist, and he's going to talk about all
21   the things I've done wrong, and this is my defending my honor.
22   Q.   Can you turn to 211-6 specifically in that report.
23   A.   Sure.
24   Q.   Do you have that document in front of you?
25   A.   I do.
```

1   Q.   And what is this document?

2   A.   This is a tabulation I put together of all of the

3   long-range plans that I was provided from Vestagen.  So it

4   looks like, at least going back as far as 2013 through 2017,

5   internally they prepared budgets, or long-range plans, which

6   show where they were, what their actual revenues were, and

7   where they expected to be in the future.

8          MS. HANNA:  Your Honor, may I publish this as a

9   demonstrative?

10          THE COURT:  Yes.

11          MS. HANNA:  Let's go ahead and put that up, please.

12      *(Marked for identification, Exhibit 211-6.)*

13   BY MS. HANNA:

14   Q.   So, in other words, this reflects the projections for

15   future revenue that Vestagen is projecting out?

16   A.   That's correct.

17   Q.   And what about these numbers are significant to you?

18   A.   Okay.  So we'll no doubt talk about this a bit more when I

19   talk about which expenses I've deducted, but one of the

20   criticisms that the -- you know, my counterpart made, was that

21   I should have deducted not just the cost of goods sold that I

22   talked about, but operating expenses.  And I strongly disagree

23   with that contention.  And one of the pieces of evidence that

24   tells me I'm right in not deducting it is looking at these

25   projections made by Vestagen.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

Q.   Let me stop you and ask that we maybe focus in on one of the columns, just to have everyone look at it.  Let's go through the top row, if we could.

A.   Sure.  So there are three categories here.  You see the first one that you've just pointed to is revenue.  And I didn't do anything with these numbers other than tabulate them.  So this shows what Vestagen reported as revenue on their forecasts, on their long-range plans, from 2010, the first row, through two-thousand-six- -- I'm sorry.  The very first row is their actual revenue for each year from 2010 through 2016.  If you add that up, that will equal the $6-million number that we just spoke about.

Q.   All right.

A.   The next line is from Vestagen's 2013 long-range plan, and that shows some actual, and then the last years show -- this is 2013, so '14, '15 and '16 and '17 are what they, Vestagen, expected their revenues to be in those respective years back in 2013.

Q.   Okay.  And that number that's being estimated by Vestagen -- and I apologize.  We cannot blow it up.  All we can do is highlight it.  What is that number that they are projected out as their revenue?

A.   So in 2017, they expected back in 2013, to have revenue of just over $35 million.

Q.   Okay.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.    And then you can see going through 2016, you've

2    highlighted as of 2016 they expected their 2020 revenue to be

3    just over $55 million.

4    Q.    Okay.  And then beneath the revenue columns, there is an

5    operating expense column.  Do you see that?

6    A.    Yes.

7    Q.    Do you find that significant to what costs should be

8    deducted from the revenue with respect to net profits?

9    A.    I do.

10   Q.    And can you explain why and what the significance of these

11   numbers are?

12   A.    Sure.  So the criticism was that I should have -- in

13   addition to deducting from Vestagen's revenue their costs of

14   goods sold, I should also have deducted their operating

15   expenses, the theory being that as you sell more, not only do

16   your costs of goods sold go up, but also your operating

17   expenses go up.  But actually, I disagree, and I think that

18   document supports me in this.

19        Operating expenses are expenses that are not associated

20   with any particular sale or good sold.  A perfect example would

21   be rent.  You can sell ten scrubs, you can sell a thousand

22   scrubs, your rent really probably doesn't change.  Maybe at

23   some extraordinary level, but it's a number that is fixed.  To

24   build the infrastructure, you have to pay rent.  And then you

25   start looking at the sales of each additional unit, and each

```
 1   additional unit brings in it a contribution margin, which is

 2   the cost to make that set against the price you sell it for.

 3   That's the contribution towards paying your rent.

 4        So here, what Vestagen is showing is that they are

 5   projecting both their revenue and their operating expenses.

 6   And you can see that in 2020, when they expect $55 million of

 7   revenue, they projected $14 million of operating expenses.  And

 8   looking back, you can see in 2018 they expected $19 million,

 9   right?  18,700,000 in revenue and just under 13 million in

10   operating expenses.  So from one year to the next, you have an

11   increase of 37 million in revenue, and then the increase they

12   expect of about a million-and-a-half in operating expenses.

13        My point is that with a tremendous growth in revenue,

14   there's almost no expected growth in operating expenses.  And

15   that makes sense, because operating expenses are not associated

16   with individual unit sold.

17   Q.   And how does that then apply with respect to calculations

18   of net profit in this case?

19   A.   So, net profit, I also looked at just what their expected

20   net profit were each year.  It didn't really play into my

21   analysis, but I tabulated it here.

22   Q.   Okay.  All right.  And then did you then receive

23   information regarding the cost of goods sold so that you can

24   use that in terms of your calculations?

25   A.   I did.
```

1    Q.   And I'm going to ask you to look at the white binder,

2    Exhibit 764-28.

3    A.   Okay.

4    Q.   Do you have that in front of you?

5    A.   Yes, I do.

6    Q.   Are you familiar with that document?

7    A.   Yes.

8    Q.   And what is that?

9    A.   This is a summary of Vestagen's profit and loss statements

10   from 2011 through February of 2017.

11   Q.   Did you prepare this document?

12   A.   Yes.

13   Q.   Can I --

14   A.   Oh, no, I didn't.  Actually, I -- I have an exact document

15   like this as well, but this one was prepared by Mr. Strombom,

16   who is, as I say, my counterpart on the other side.

17   Q.   So this was Vestagen's expert who prepared this chart?

18   A.   Right.

19        MS. HANNA:  Your Honor, may I publish 764-28 as

20   demonstrative?

21        THE COURT:  Yes.

22        MS. HANNA:  Thank you.

23   *(Marked for identification, Exhibit 764-28.)*

24   BY MS. HANNA:

25   Q.   Can you explain to us what is significant about this

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    document with respect to your opinions.

2    A.    Sure.  So in the upper right-hand corner, you see the same

3    revenue figures we looked at from my report, and it totals up

4    there $6.2 million.  That's from 2011 through February 2017.

5    And below that you see -- and these are Vestagen's numbers --

6    cost of goods sold.  And that section above that, right

7    there -- thank you.  So these are -- and this is a term of art.

8    This is what the accountants for Vestagen call these category

9    of expenses, because this is the cost to make the goods that

10   they sold.  And so they had costs of goods sold of 4.1 million,

11   yielding what's called a gross profit of $2,000,072.  This

12   excludes 2010.  With 2010 it would be 2.1 million, another

13   $30,000 or $40,000.  So this tells me, after deducting the

14   expenses to generate the sales of VESTEX, Vestagen made a gross

15   profit of $2.1 million.

16   Q.    Do you have -- based on the information that you have

17   reviewed, have you reached an opinion as to the amount for

18   disgorgement of profits from Vestagen?

19   A.    $2,110,000.

20   Q.    Thank you.

21         You also said that you had reached an opinion with respect

22   to lost profits for Strategic Partners.

23   A.    Yes.

24   Q.    Can you tell us what you did with respect to that

25   calculation?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.    Yes.   So it's very, very similar.   I've got information on

2    Strategic Partners, their financials.   Now, the difficulty here

3    is that what I'm trying to do is figure out, if Vestagen had

4    not sold their VESTEX products improperly, some of that would

5    have been sold by SPI, by Strategic Partners.   How much?

6    That's the challenge.

7          The first problem is, I have to know what number of units

8    Vestagen sold of VESTEX over time.   That's something I asked

9    for many times, and I've seen correspondence where your firm

10   has asked for it, too, but I only ever got the unit sales of

11   VESTEX for six months in 2011.   I do, however, have revenue for

12   Vestagen for VESTEX for 2010 through 2017, February, which we

13   just looked at.   So what I was able to do is use the ratio of

14   units I have back in 2011 and price changes for SPI over that

15   same time period and approximate what the units sold would have

16   been in each year for VESTEX.   I actually have four or five

17   pages where I had to go through the machinations to do that,

18   and I'm happy to go through the details of that, but I feel

19   pretty confident that I've got a good approximation of units

20   sold each year, because it is based on real revenue and it is

21   based on actual units for at least 2011.

22   Q.    Were you able to use that data and extrapolations from the

23   data that you had to create a chart reflecting what you felt --

24   excuse me -- felt was the gross -- or the lost profits for

25   Strategic Partners?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.   Yes.

 2   Q.   Can I ask you to turn -- and this will be in the black

 3   binder 3 to Exhibit 347-7, please.

 4        Do you have that document before you, Mr. Weiner?

 5   A.   Yes, I do.

 6   Q.   And -- oh, I may have sent you to the wrong one.  Did I

 7   say 347-7?

 8   A.   Yes.  I think you meant 6, maybe?

 9   Q.   I did.  I did.  I'm so sorry.  For the record, let me

10   clarify.  347-6.

11        Do you have that document before you?

12   A.   Yes.

13   Q.   And what is this document?

14   A.   So this is my calculation of the lost profits, lost to

15   SPI, to Strategic Partners.

16        MS. HANNA:  May I publish this as demonstrative,

17   please?

18        THE COURT:  Yes.

19        MS. HANNA:  Thank you.

20        (Marked for identification, Exhibit 347-6.)

21   BY MS. HANNA:

22   Q.   And can you explain what this document reflects?

23   A.   Yes.  So remember I talked about how I went through and

24   estimated what the number of units sold by Vestagen was for

25   each of the -- I -- I've got four categories of scrubs.  This
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    is based on the company's convention.  I didn't devise this.

2    This is tops, pants, lab coats, and then other, which is a

3    catchall category.  So now I know Vestagen's units sold.

4         The other element that I have to determine is, okay, if

5    Vestagen sold this number of units, well, how much would have

6    gone to Strategic Partners?  And so what's a common way to

7    estimate that is to look at market share.  And so I've got some

8    nice documents which look at the scrubs market and talk about

9    what Vestagen -- I'm sorry, what SPI's market share was in the

10   relevant time period.  And that's kind of the next line there,

11   and you can see it gets a little specific, but it's almost

12   always around 40 percent.

13        So SPI had about 40 percent of the wholesale market; in

14   other words, manufacturing scrubs.  So I apply that to the

15   units sold in each category, I apply the gross profit per unit

16   that SPI had for each of those categories in each year, and

17   then I've got my math.  And I know that had those units,

18   40 percent, roughly, of Vestagen's units been sold by SPI, they

19   would have made $501,000 off of that.  That is their lost

20   profits.

21   Q.   Is that your opinion based on your education, training

22   and experience with respect to Strategic Partners' lost

23   profits?

24   A.   Yes.

25   Q.   Have we covered the opinions that you've reached in this

1  case, Mr. Weiner?

2  A.   We have, yes.  Yes.

3  Q.   I know that you've also calculated some prejudgment

4  interest with respect to these numbers.  Would you like to tell

5  us about those as well?

6  A.   Sure.  So for the disgorgement of profits, it's $527,000.

7  That would be the interest on the $2.1 million of disgorgement

8  profits.  And for the SPI lost profits, it's $132,800.  That

9  would go with the $501,000 of lost profits.

10     So you have 2.1 million in disgorgement profits plus

11  527,000 in interest, or you have 501,000 in lost profits plus

12  132,000 in interest.

13 Q.   Thank you.  Thank you very much for your time.

14 A.   You're welcome.

15         THE COURT:  Okay.  Cross-examination.

16                     **CROSS-EXAMINATION**

17 BY MS. HIGHTOWER:

18 Q.   Good morning, Mr. Weiner.

19 A.   Hi.  Good morning.

20 Q.   I have just a couple questions for you.

21     The primary focus -- the first assignment that you were

22 given was for the losses that had led to -- allegedly been

23 sustained by Strategic; is that correct?

24 A.   Yes.

25 Q.   And the information that you got, you were assisted by

1    your staff in preparing the calculations and the charts?

2    A.    Yes.

3    Q.    What was your understanding of why consumers of Vestagen

4    VESTEX products would purchase that product?

5    A.    Because they were told, they believed, that VESTEX had

6    some properties that were unique, that didn't exist otherwise

7    in the marketplace.

8    Q.    And who told you that?

9    A.    That's my read on the complaint.  That's my speaking with

10   attorneys.  That's my reading the depositions in this case.

11   Q.    All right.  And when you're talking about the attorneys,

12   you're talking about the attorneys representing Strategic,

13   correct?

14   A.    Yes, that's right.

15   Q.    All right.  And then you -- were you able to document the

16   fact that SPI and Vestagen were actually competitors in the

17   scrub market?

18   A.    Yes.

19   Q.    All right.  And where were you given that information?

20   A.    It's in a lot of the discovery materials.  In fact, I --

21   even at my deposition I had a table which shows kind of a map

22   of the marketplace and shows exactly that.

23   Q.    All right.  And did you also receive information about

24   clients or customers of Strategic that actually turned to the

25   Vestagen VESTEX product?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.   No.

2    Q.   Did you ever have any understanding that Strategic may

3    have lost customers to Vestagen because of long-term purchase

4    agreements that affected the Strategic sales?

5    A.   I'm sorry.  That former customers of SPI would have gone

6    to Vestagen?

7    Q.   Correct.

8    A.   No.

9    Q.   You didn't have any of that information?

10   A.   Right, I don't have any evidence of that one way or the

11   other.

12   Q.   All right.  What information did you have as to when the

13   alleged false advertising began?

14   A.   So I don't have an exact date.  Initially I was told maybe

15   2010/11.  So I think my initial report I had 2011, and then I

16   was told it's probably more accurate to do 2010.

17   Q.   All right.  And who gave you that information?

18   A.   Counsel.

19   Q.   When they talk about the advertising affecting Strategic,

20   do you have any understanding as to whether or not there was an

21   effect on Strategic in, say, 2010, when they told you there was

22   this false advertising?

23   A.   Well, to the extent that there is an impact, it would be

24   sales made by VESTEX of -- of VESTEX, that, of course, come at

25   the expense of the overall scrubs market.  If those sales were

```
 1   made improperly, then, sure, they're going to affect SPI.
 2   Q.   Were you given information about the Vestagen VESTEX
 3   scrub?
 4   A.   I mean, it depends how specifically.  You're talking about
 5   information.  I mean, sure, there's lots of discussion about
 6   it.  And the claims.
 7   Q.   Is it important, in comparing sales and losses in a case
 8   such as this, to be able to compare a product with another
 9   product that is similar?  Not exactly the same, but at least
10   has similar qualities?
11   A.   To compare them in what way?
12   Q.   If you are going to talk about the sales of various
13   products, do you have an understanding that Strategic has a
14   number of different type products?
15   A.   They do.
16   Q.   Do you know how many products VESTEX has?
17   A.   How many products?
18   Q.   How many products.
19   A.   No, I don't know the number of what you would call a SKU,
20   a store keeping unit.  They have the four categories, but those
21   categories are, obviously, much more specific.  By color, by
22   size.
23   Q.   Do you know the specific attribute of the VESTEX garment
24   in 2010?
25   A.   I know the claimed attributes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1   Q.   What do you understand to be the claimed attributes?

2   A.   So it's referred to as AMFB, antimicrobial fluid barrier.

3   Q.   But you pronounce that better than I did yesterday.

4        Do you have an understanding as to whether or not

5   Strategic had a similar product on the market in 2010?

6   A.   I don't think they did.

7   Q.   All right.  So would you explain, please, why you took it

8   back to 2010 as the alleged false advertising affecting any

9   sales of Strategic?

10           THE COURT:  Well, before you go on, were your

11  calculations based on 2010 or 2011?

12           THE WITNESS:  2010, Your Honor.

13           THE COURT:  2010.  Okay.  Go ahead.

14           THE WITNESS:  Yes, of course.

15       So, first of all, my understanding is that Vestagen

16  misrepresented what the qualities of this antimicrobial fluid

17  barrier product was.  And in fact, your expert criticized me

18  for failing to recognize that Vestagen introduced an innovation

19  to the market, which would have created a new market.  I

20  strongly disagree with him, because any sales of Vestagen would

21  have come at the expense of other scrubs.  If it's an

22  improvement, then companies that were purchasing regular

23  scrubs, standard scrubs, would have said, "Hey, this is a great

24  new product, I'm gonna buy it."  But scrubs only last two and a

25  half years, anyway.  So it's not like it created a new industry
```

1   where people were buying scrubs who otherwise would not have

2   bought scrubs before.

3   BY MS. HIGHTOWER:

4   Q.   Mr. Weiner, if we can go back to my original question.  In

5   2010, were you aware of a comparable product to the VESTEX that

6   was sold by Vestagen, a similar product that was part of the

7   Strategic line of products?

8   A.   To my knowledge, there was not another product that

9   claimed to be antimicrobial.

10   Q.   All right.  Was there anything in 2011?

11   A.   Not to my knowledge.

12   Q.   2012?

13   A.   The same.

14   Q.   All right.   2013?

15   A.   The same.

16   Q.   Please explain, then, how you can compare the sales or any

17   losses from 2010 to 2013 when Strategic does not have a

18   comparable product to what was being produced by Vestagen.

19   A.   Because these goods are substitutes, and if Vestagen sold

20   their products by misrepresenting the properties, those sales

21   by misrepresentation came at the expense of what those

22   companies would otherwise have purchased.  And I've assumed

23   they would have otherwise purchased scrubs.

24   Q.   And your understanding that they were falsely advertised

25   in the attributes of their product came from counsel; is that

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    correct?

2    A.    Yes, and -- and the legal --

3    Q.    Thank you.

4    A.    -- pleadings.

5    Q.    When we are going to -- you talked about the gross revenue

6    of Vestagen and the calculations that you had based on that

7    revenue, the interest and those types of things, correct?

8    A.    Yes.

9    Q.    But these were -- was revenue from 2010 to 2017, correct?

10   A.    Yes.

11   Q.    Okay.  Did you ever receive any documentation from the

12   attorneys for Strategic that would have established their claim

13   of continued false or misleading statements?

14   A.    No.  I -- I mean, it just doesn't come into my expertise.

15   I didn't look for it nor see it.

16   Q.    All right.  Were you able to calculate the number of

17   consumers that would have bought Strategic from the time that

18   they came out with a comparable product to the sales of

19   Vestagen?  I'm sorry, that came out wrong.

20        Were you able to calculate the percentage of consumers

21   that would have purchased a Strategic product, once it came

22   onto the market, that was similar to the VESTEX?

23   A.    No, I didn't look at that.

24   Q.    You've already told us what you understand as to what the

25   Strategic claims were making or -- sorry, strike that.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    You've already testified as to your understanding of the

2    claims that Strategic is making as far as any false advertising

3    on the part of Vestagen, correct?

4    A.   Yes.

5    Q.   And were you able to verify any of that information as you

6    went about preparing your report?

7            THE COURT:  Let me just interrupt for a second,

8    because I want to make sure that it's clear to the jury.

9        You're testifying as to what the economic results would be

10   if there was false advertising.  You're not testifying that the

11   advertising was false or not; you're just saying if it was

12   false, this would be the economic result.

13           THE WITNESS:  That's a hundred percent correct, Your

14   Honor.

15           THE COURT:  And if it wasn't false, you wouldn't have

16   these economic results.

17           THE WITNESS:  Exactly.

18           THE COURT:  And you're not an expert testifying

19   whether it's false or not, just the economic results.

20           THE WITNESS:  That's right.

21           THE COURT:  Okay.  I just want to clarify that for the

22   jury.

23           MS. HIGHTOWER:  Thank you very much, Your Honor.

24           THE WITNESS:  So, I'm sorry, I need the question

25   again.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              MS. HIGHTOWER:  That's all right, I forgot it already.
 2              THE COURT:  Okay.
 3    BY MS. HIGHTOWER:
 4    Q.    Let's see.  Now, the comparisons that you were making in
 5    2013 or 2014 as to the losses of Strategic, were you comparing
 6    any of the products, either from Strategic or VESTEX, to the
 7    regular scrub market?
 8    A.    Yes.  Yes.
 9    Q.    And why?
10    A.    Well, so that's what I was saying earlier, is if Vestagen
11    sold their goods under the misrepresentation that they had
12    properties that they did not have, those sales came at the
13    expense of companies would have purchased their scrubs
14    elsewhere.  And I've assumed that they would have purchased it
15    from the marketplace for scrubs, of which SPI had 40 percent.
16    Q.    Do you -- okay.  You indicated Strategic had 40 percent of
17    the market, correct?
18    A.    Yes.
19    Q.    And do you have any information as to the effect of the
20    VESTEX on the remaining competitors in the market?
21    A.    I'm not sure what you mean by that.
22    Q.    Okay.  If Strategic has 40 percent, did you calculate the
23    market share for VESTEX -- or Vestagen?
24    A.    No.
25    Q.    Did you calculate the market share for any of the other
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1   competitors?

2   A.   I didn't, but it's actually in the documents I brought to

3   my deposition.  So there's a breakdown of market share by

4   company, but, obviously, I'm focusing on SPI.

5   Q.   Okay.  But so, as you sit there, you don't know what those

6   are, correct?

7   A.   No, I don't, not without looking.

8   Q.   All right.  Okay.  I think that -- when you put up the --

9   one other question that I do have.

10       When you put up the forecast, the long-range planning of

11  Vestagen for their products, long -- how would you define

12  long-range planning?

13  A.   Well, I mean, I think it's somewhat self-explanatory,

14  that it is the plan that a company is operating under.  They

15  are gearing up to achieve what they set forth in those

16  projections.

17  Q.   Okay.  But they are projections, are they not, for 2018,

18  for example?

19  A.   Yes, of course.

20  Q.   2019?

21  A.   Yes.

22  Q.   2020?

23  A.   Yes.

24  Q.   And it doesn't take into account any contingencies that

25  can take place in between, does it?
```

```
 1   A.   Well, it doesn't know those contingencies, but usually
 2   good plans take into account anticipated speed bumps.  You
 3   know, as much as you can have any -- anyone can have a crystal
 4   ball, of course.
 5   Q.   All right.  In your calculations of Strategic having
 6   40 percent of the market share, if you have not accounted for
 7   the losses to the remaining 60 percent or 50 or 60 percent of
 8   the market, how can you evaluate that 40 -- the losses that
 9   went to Strategic?
10   A.   Well, because I'm taking 40 percent.  I know what their
11   share of the market was, right?  So if I look at the total
12   revenue that would have been generated or the total number of
13   units, I'm assuming 40 percent of them would have gone to SPI.
14   I don't worry, for the purposes of my assignment here, what the
15   other 60 percent would have done.
16   Q.   All right.  And you were shown an exhibit which identified
17   the sales that had been generated by Vestagen from 2010 to
18   2017, correct?
19   A.   Yes.
20   Q.   And in 2010, what were the sales that had been generated
21   by Vestagen?
22   A.   Is it okay if I refer to my own notes?  I think it's
23   probably quicker.
24   Q.   I have no problem with it.
25   A.   Thank you.  $73,800.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1   Q.   All right.  And did you calculate what the amount of sales

2   of Strategic was for 2010?

3   A.   I can't remember, honestly.  Let me see.

4   Q.   Are those in your notes?

5   A.   I did not look at that.  I probably have them in my backup

6   notes, but I didn't have to look at their actual sales, because

7   I'm looking at the units they would have sold had VESTEX not

8   been sold instead.

9   Q.   Okay.  If you're looking at the units that would have been

10  sold, don't you need to identify that which was sold?

11  A.   From SPI?  No.  No.  Because I'm assuming that 40 percent

12  of the VESTEX sales would have been additional sales to SPI.

13  Q.   Okay.  But you don't know the total amount that they made

14  in 2010?

15  A.   The total amount that they made just in general?

16  Q.   In general.

17  A.   I think I do have that somewhere.

18  Q.   Okay.  For SPI?

19  A.   Right.

20  Q.   Okay.

21       MS. HANNA:  Objection, Your Honor, beyond the scope.

22       THE COURT:  Overruled.

23       THE WITNESS:  Okay.  So here, on C1 of my report, I

24  have a summary of total sales for the whole SPI company in 2010

25  and their cost of sales.  So total sales were $221 million, and
```

1    total costs were $133 million, in 2010.

2            MS. HIGHTOWER:  Thank you very much.  I have no

3    further questions.

4            THE COURT:  Okay.  Redirect?

5            MS. HANNA:  Thank you.

6                    **REDIRECT EXAMINATION**

7    BY MS. HANNA:

8    Q.   Mr. Weiner, I just want to follow up on something that the

9    Court mentioned earlier.

10        As part of your assignment with respect to calculating

11   losses, are you asked to make certain assumptions for those

12   calculations?

13   A.   Always.

14   Q.   And in this case, were the assumptions that you were

15   making based on the allegations in the case of false

16   advertisement by Vestagen?

17   A.   Yes.

18   Q.   It was not your task to go and look to see or make a

19   determination with respect to those allegations, correct?

20   A.   That -- that's correct.  I pick up where that leaves off.

21   Q.   Okay.  Just very briefly, and I just want to make sure

22   that we're clear on this point.  Even though there was no

23   antimicrobial fluid barrier product offered by SPI until 2014,

24   2015, can you please explain why it was appropriate to use loss

25   of profit numbers going back to 2010?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    A.    Vestagen was -- again, I'm assuming that the allegations

2    are right, but Vestagen was making a claim that their product

3    offered benefits that it did not offer.  And companies that

4    bought from them bought under that misunderstanding of what

5    they were getting, that advantage.  Had they not been misled,

6    then they would have stayed with their scrubs that they were

7    purchasing.  And 40 percent of the manufactured scrubs come

8    from SPI.

9    Q.    Thank you.

10         And that analysis is different, is it not, than the

11   disgorgement of profits number that you gave us, the

12   $2.1 million number that you gave us earlier?

13   A.    It is different, that's right.

14   Q.    Totally different analysis?

15   A.    Completely, yes.

16   Q.    Has nothing to do with what products Strategic Partners

17   had or didn't have, correct?

18   A.    Right.  Strategic Partners is irrelevant to that first

19   calculation.

20   Q.    Okay.  Thank you.

21         I have nothing further.

22              THE COURT:  Any recross?

23              MS. HIGHTOWER:  No, Your Honor.

24              THE COURT:  You may step down.

25         May this witness be excused?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1          MS. HANNA:  Yes, Your Honor.

2          THE COURT:  Thank you very much for coming in, sir.

3          THE WITNESS:  Thank you, Your Honor.

4          THE COURT:  Next witness.

5          MS. HANNA:  Your Honor, we'd like to call Mike Singer

6    to the stand.

7          THE CLERK:  Right here to be sworn.

8        Do you solemnly swear the testimony that you are about to

9    give in the matter now before the Court shall be the truth, the

10   whole truth, and nothing but the truth, so help you God?

11         THE WITNESS:  I do.

12         THE CLERK:  Thank you.  You may be seated.

13       Could you please state your full name for the record and

14   spell your last name.

15         THE WITNESS:  Michael Laurence Singer, S-i-n-g-e-r.

16         THE CLERK:  Thank you.

17         THE COURT:  Okay.  You may inquire, Counsel.

18         MS. HANNA:  Thank you.

19                    **MICHAEL LAURENCE SINGER,**

20                 **having been first duly sworn,**

21                     **testified as follows:**

22                    **DIRECT EXAMINATION**

23   BY MS. HANNA:

24   Q.   Good morning, Mr. Singer.

25   A.   Good morning.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.    Sir, what is your occupation?

2    A.    I'm the chief executive officer of Strategic Partners.

3    Q.    How long have you been affiliated with Strategic Partners?

4    A.    Since we bought -- since we bought the company from

5    Cherokee in 1995.

6    Q.    Can you tell us a little bit about your education and

7    background before we talk more about Strategic Partners,

8    please?

9    A.    Yes.  I grew up here in Los Angeles.  I went to school at

10   the University of Southern California.  I have a bachelor of

11   science in business with an emphasis in entrepreneurship.

12   Q.    And can you tell us your background and experience in the

13   healthcare field and textile industry?

14   A.    In 1989, I joined a company in Pacoima called Cherokee,

15   and in 1990, I took over a small medical uniform division that

16   was floundering, and then grew that business between 1990 and

17   1995, and then I made them an offer to buy the company in 1995

18   and raised -- raised money and put all the money I had into the

19   company as well and bought the company in 1995.

20   Q.    And you've been with the company since then?

21   A.    Correct.

22   Q.    Have you always held the position of chief executive

23   officer?

24   A.    I have.

25   Q.    Can you tell us a little bit about your perspective of

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Strategic Partners with respect to the healthcare industry and

2    healthcare workers?

3    A.   So we -- our customers, our end consumers, are healthcare

4    workers, primarily healthcare workers.  Sometimes it extends a

5    little beyond that, but we also serve children who wear school

6    uniforms.  We have a new chef wear business where we're serving

7    chefs.  But the majority of our business is geared towards

8    healthcare workers, and so we do a lot of work to understand

9    healthcare workers and their needs, and we try and design

10   really great fashionable garments, garments that fit really

11   well, are really comfortable to wear, garments that are --

12   excuse me -- professional, wrinkle-resistant, that have

13   consistent color, so that as you wear the uniform over time,

14   everyone looks professional and all the colors match.  So if

15   you buy a uniform today and you work in a medical environment,

16   and someone wears -- gets hired nine months from now, and

17   you've been washing your uniform for nine months, and they get

18   hired, the color consistency needs to stay the same.

19       So it's a very quality-intensive business.  It's a very

20   service-intensive business.  We have about 3,000 retail

21   partners across the country, and they sell the product to the

22   end consumer, as it's very complex to be both a manufacturer

23   and to be the retailer.  So we're a manufacturer.  We design

24   and make the garments, and then we sell those garments to

25   retailers, and retailers in their local communities have a

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    store, display the product, go out and call on doctor and

2    dental offices and hospitals and nursing homes, and they

3    provide the service to the consumer.

4    Q.   Was Baptist Hospital one of -- or Healthcare, one of the

5    clients of Strategic Partners?

6    A.   Yes.  Baptist was an atypical customer for us, because

7    we're typically selling to retailers.  Occasionally a hospital

8    will actually go into the retail business themselves.  They'll

9    have a retail division.  Sometimes they have a pharmacy.

10   Sometimes they have -- they sell medical products.  They open

11   different types of stores.  Sometimes our retailers may lease a

12   space in a hospital and open a store there, but sometimes the

13   hospital is the retailer themselves, and they actually open up

14   a retail store.

15        So in this case, Baptist had opened a retail store.  So we

16   don't sell direct to hospitals.  We sell to retail stores.  But

17   in this case, they were a retail store.

18   Q.   Okay.  So just so that we're clear, Strategic Partners was

19   selling wholesale to the retail store of Baptist Hospital,

20   correct?

21   A.   Correct.  And Baptist was selling the product at the

22   retail to their consumer.

23   Q.   Okay.  So their healthcare workers at Baptist Hospital

24   were purchasing the scrubs from the store at Baptist Hospital?

25   A.   That's correct.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   Q.   Got it.
 2        During what period of time was Baptist Hospital a client
 3   of Strategic Partners?
 4   A.   I don't recall the years exactly, but it was for a number
 5   of years.
 6   Q.   And do you recall when you lost that client?
 7   A.   I'm not sure if it was in 2012 or 2013.  I'm not sure of
 8   the time frame.
 9   Q.   Do you know who you lost the client to?
10   A.   Yes.  To Vestagen.
11   Q.   Okay.  Sir, as part of your involvement with the
12   healthcare field, Vestagen's involvement, does Vest- -- I'm
13   sorry, strike that.
14        As part of Strategic Partners' involvement with the
15   healthcare industry, do they provide any scholarships or
16   financial assistance?
17   A.   Yes.  We have a scholarship program.  We have a
18   scholarship program for nursing students.  We also sponsor the
19   DAISY Award for nursing excellence, and that's given out in
20   hospitals throughout the world every month, to different
21   nurses.  We had our own award we had created before that called
22   the Nurse I Am.  Actually, we had a video that we created
23   outlining four outstanding nurses.  It was a documentary we
24   produced with an award-winning documentarian called "A Nurse I
25   Am," and that also had been played in about 400 nursing schools
```

1  across the country.  And then we created an award, our own

2  award for nurses.  That was called the Inspired Comfort Award.

3  So we're trying to always think about the market and do things

4  to support medical workers and nurses.

5  Q.  Speaking of that market segment, we've heard a little bit

6  about hospital scrubs.  Oh, we've heard a lot about hospital

7  scrubs, both treated and untreated scrubs.

8     Do you understand those terms as I use them?

9  A.  Yes.

10  Q.  Traditionally, prior to coming out with the Certainty and

11  Certainty Plus products -- let me start with that point.

12     Going backwards, traditionally, was kind of scrubs was

13  Strategic Partners selling at that time?

14  A.  We were just selling great scrubs, really fashionable

15  scrubs, but they were untreated.

16  Q.  Okay.  And at what point in time did Strategic Partners

17  start looking at the possibility of developing a treated

18  product line?

19  A.  Well, we get contacted by a variety of companies, and

20  starting in the early 2000s we began getting contacted by

21  nursing students, by the University of California's technology

22  office, by various companies that had various technologies.

23  Our own fabric supplier had various technologies.  So there

24  were a variety of technologies in the marketplace.  And the

25  news around hospital-acquired infections began to increase, and

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1  there were news stories in -- like in two-thousand- -- sometime

2  before 2010, maybe 2008, that, you know, medical workers

3  shouldn't be wearing their scrubs out in public, because it

4  might spread.  Things like that.

5  Q.   So when did you start hearing about antimicrobial scrubs?

6  A.   I think we heard about it in 19 -- in the 1990s there

7  were studies, but, you know, we started hearing about it more

8  frequently beginning in 2004, and it started increasing in

9  the late, you know, 2008, '9, '10 period.  You know, we heard

10  from multiple companies between two-thou- -- call it 2008 and

11  2011.

12  Q.   What were these companies seeking when they were

13  contacting Strategic Partners and you specifically?

14  A.   Some of them were -- well, for example -- well, some of

15  them were -- were ingredient -- I would call them ingredient

16  technology companies.  They were companies that had

17  antimicrobial technologies.  And there were a variety of those

18  types of companies.  Some of them had been around for a long

19  time.  Some were brand-new.  Some had been selling product into

20  the athletic wear industry.  Some had been selling into -- or

21  attempting to sell into the medical industry.  Sometimes we got

22  contacted by healthcare workers themselves who had ideas.

23  Q.   Okay.  Prior to meeting with Vestagen or hearing about

24  Vestagen, had you been contacted by anyone about a scrub that

25  was treated both with antimicrobial and a fluid barrier?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.    Yes.

 2    Q.    Okay.  I'm going to ask you to take a look at Exhibit 826.

 3    That's going to be in the white binder number 6.

 4           THE CLERK:  And Counsel, I'm sorry, 826?

 5           MS. HANNA:  Yes.

 6           THE WITNESS:  Okay.

 7    BY MS. HANNA:

 8    Q.    Do you have that in front of you, Mr. Singer?

 9    A.    I do.

10    Q.    Do you recognize this document?

11    A.    Yes.

12    Q.    What is this document?

13    A.    This is a -- a summary of a product that -- that we had

14    been shown by a -- there was an X-ray tech, his name was

15    Darren Nunn, and he actually was working in the industry.  He

16    actually had a pretty innovative idea.  He lived in

17    Bakersfield.  He drove out to see me.  And he built this

18    technology.  It was like a -- he was trying to prevent fluids

19    from getting into the garment, and so he created this, or

20    utilized this zipper, so that the garment had a zipper kind of

21    towards the back or towards the side of it, and the zipper was

22    like a waterproof zipper, so there were no holes in the garment

23    at all.  And so he was proposing that this would be a

24    protective garment and it would have antimicrobial technology

25    as well.
```

1   Q.   And the date of this document, or at least the e-mail, is

2   May 27th, 2008?

3   A.   Yeah.  We may have met with him a few days prior to that,

4   but yes, that was May 27, 2008.

5   Q.   Is that prior to hearing or learning about Vestagen?

6   A.   Yes.

7   Q.   Can you turn to 827, please.

8   A.   Okay.

9   Q.   This is, for the record, an e-mail dated July 11th, 2008.

10  Do you see that?

11  A.   Yes.

12  Q.   Is this another reach-out by another entity regarding

13  antimicrobial --

14  A.   It was.  It was from a gentleman named Joshua Pniewski

15  from BioShield, and they had another product that was

16  antimicrobial.

17  Q.   This is again before you had ever heard of Vestagen?

18  A.   Yes.

19  Q.   Okay.  Can you turn to Exhibit 828.

20  A.   Okay.

21  Q.   For the record, is this a January 8th, 2009 e-mail sent to

22  you from Scott Sigman?

23  A.   Yes.  This is actually multiple e-mails.  Underneath was

24  an article that Wendell Mobley had sent to me and Marty

25  Morawski, and these two articles were talking about changes

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    that were happening in the medical industry, the lieutenant

2    governor of New York explaining why the public should be

3    concerned when healthcare professionals were wearing their

4    scrubs in the market, and then there was a similar piece that

5    appeared in the AARP.  And so Marty -- or Wendell was flagging

6    this, saying that, you know, this is a real concern, because,

7    you know, we sell products to nurses, and nurses wear these

8    products in the field, and if people really believe that it

9    was spreading microbes, that it could ultimately change the

10   market.  But I forwarded that on to Scott Sigman for his

11   review.  Scott was head of manufacturing.  And Scott was not a

12   big proponent of antimicrobials at the time, so he was telling

13   me why he didn't believe in it and what we should do

14   differently.

15   Q.   Okay.  But this was another inquiry regarding

16   antimicrobials.  Did this begin to be something that you were

17   looking into at this point?

18   A.   Absolutely.

19   Q.   Okay.  And Exhibit 829 is next.  Can you take a look at

20   that.

21   A.   Yes.

22   Q.   This is an April 17th, 2009 e-mail.  You recognize this

23   e-mail?

24   A.   I do.

25   Q.   And what is this?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.    This is a gentleman named Ron Cunningham, who actually

 2    worked for us for a short period of time.  He had been

 3    advocating antimicrobial technologies as well, and he left to

 4    introduce a new line of antimicrobial products under the Izod

 5    brand name.

 6    Q.    Okay.  Again, before you'd ever heard of Vestagen?

 7    A.    Yes.

 8    Q.    Okay.

 9    A.    His company is licensed with Ultra-Safe.  It was --

10    anyways, it was antimicrobial product.

11    Q.    Okay.  Exhibit 830.  Is that a June 3rd, 2009 e-mail to

12    you from Scott Sigman?

13    A.    Yes.  This was about another company, called ProShield

14    5000, that were offering protection for textiles, linens and

15    towels.  Scott was saying this is the product that Landau, what

16    was one of our largest competitors, was using.  Also it

17    mentioned Nanotex, which was a company that made a fluid

18    barrier product, and they're using their product at Target, and

19    that a company called Nice Dye that we were working with was

20    also manufacturing their product.

21    Q.    Nanotex, that's the fluid barrier technology that Vestagen

22    has ended up using?

23    A.    No.  This is a technology that was one of Times' products

24    of the year in the year 2000, when Nanotex came out, and

25    they're a company that we utilized.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.    That's right, for fluid barrier technology.

2    A.    Yes.

3    Q.    When and how did you hear about --

4    A.    Sorry.  I think I said 2000.  It was 2002.

5    Q.    Okay.  Thank you for that clarification.

6          When did you first hear about Vestagen?

7    A.    I think we first heard about Vestagen in 2009.

8    Q.    Okay.  I'm going to ask to switch binders to volume -- the

9    white binder, Volume 1, please, and sir, I'm going to ask you

10   to turn to Exhibit 527 if you can.

11   A.    Okay.

12   Q.    Can you describe -- can you describe for us what this

13   document is?

14   A.    This document is an article about Vestagen that came out

15   in 2009, and there was a discussion -- you know, it was one of

16   many we had seen, and so there was a discussion internally

17   about it.

18   Q.    And the first page is an e-mail, looks like from Susan

19   Nunez to you; is that right?

20   A.    Well, actually, the e-mail was from Marty Morawski, the

21   article, to me and Bob Pierpoint.  Bob, who read it, said "I

22   think it's clear that someone's gonna get this right and market

23   it and it could be a game changer," and then I commented from

24   there, and we ultimately were talking about needing to find a

25   fabric expert, because we were being approached by so many

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    different companies, and there were so many companies in the

2    market, and it was challenging to figure out -- you know,

3    everyone came in and said how great their product was.  And so,

4    you know, when this person and that person, every person was

5    talking about how great, we felt like we need an expert to help

6    us figure it out.

7    Q.   So at this point I'm just trying to identify the document

8    so that I can ask to see if I can move it into evidence.

9         Your Honor, may I move Exhibit 527, 1 and 2, into

10   evidence?

11             THE COURT:  What was the exhibit number again?

12             MS. HANNA:  572 dash -- oh, I'm so sorry.  Everybody

13   just corrected me.  It's 527 dash 1 and 2.

14             THE COURT:  527 dash --

15             MS. HANNA:  1 and 2.

16             THE COURT:  Okay.  It will be received.

17             MS. HIGHTOWER:  No objection, Your Honor.

18             THE COURT:  It will be received.

19        *(Received in evidence, Exhibit 527-1, 527-2.)*

20   BY MS. HANNA:

21   Q.   So let's go ahead and put that up so we can see what it is

22   you were describing earlier.  Let's start with the article that

23   is actually on page 2 of this exhibit.

24        Is this the article that was brought to your attention in

25   that e-mail?

1    A.    Yes.

2    Q.    Is that a picture of Mr. Favret?

3    A.    Yes.

4    Q.    The heading there, "This Germ-Killing Fabric May Save

5    Lives," Vestagen, by Ben Favret, do you see that?

6    A.    Yes.

7    Q.    Okay.  Had you heard of Vestagen at all prior to that?

8    A.    No.

9    Q.    Okay.  Had there been anyone else in the industry claiming

10   that their scrubs save lives?

11   A.    No.

12   Q.    Okay.  And then let's take a look at the e-mail.  I'm

13   sorry.  I'm sorry.  Can we just go back to the article for just

14   a moment?

15        Did that article disclose that the scrubs that were going

16   to be rolled out would include both an antimicrobial and a

17   fluid barrier technology?

18   A.    Yes.

19   Q.    Did it also disclose that the technology were being

20   licensed from Schoeller?

21   A.    Yes.

22   Q.    Okay.  Okay.  Let's go back to the e-mail that sent you

23   that article, and I think you were referencing your response,

24   which is the December 22nd, 2009 e-mail.  You say, "This one

25   probably isn't it."  What did you mean by that?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.   Well, we were just seeing so many at the time, and, you
 2    know, there was nothing about it that made us feel like this
 3    was gonna be the panacea.
 4    Q.   Okay.  But at that point did you start -- I'm going to
 5    withdraw that.
 6         What, if any, effect did this have with respect to
 7    Strategic's plan regarding treated scrubs?
 8    A.   It was just another data point of many at the time.
 9    Q.   At some point after 2009, were you contacted by someone
10    from Vestagen?
11    A.   Yes, sometime later, I think in 2011.
12    Q.   Do you recall who contacted you?
13    A.   It was either Ben Favret or Brian Crawford.  I think it
14    was -- I think it was Mr. Favret.
15    Q.   And what do you recall was the subject of that
16    discussion?
17    A.   They contacted us, were very positive about their
18    product, felt like they had the best solution, and, you
19    know, they were a startup and were looking for capital and,
20    you know, were interested in finding potential partners, if I
21    remember correctly.
22    Q.   Did you at some point agree to listen to their
23    presentation?
24    A.   Yes.  We listened to everyone's presentation.
25    Q.   Okay.  And did Vestagen actually come out and make a
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1  presentation to Strategic Partners?

2  A.   Yes.

3  Q.   I'd like you to turn to Exhibit 545, please.

4       Do you have that document in front of you?

5  A.   Sorry.  Yes, I do.

6  Q.   It's entitled "Strategic Partners/Vestagen Agenda."  It's

7  dated March 10, 2011.  Are you familiar with that document?

8  A.   Yes.

9  Q.   What is this document?

10 A.   I believe this is a document that -- I don't recall.  I

11 think it's a document they provided, but I'm not a hundred

12 percent sure.

13 Q.   Okay.  Then I would ask you to take a look at Exhibit 544.

14 A.   Actually, this is a document they provided.  It says "See

15 Brian's questions below."  So this would be from Mr. Favret,

16 because he's talking about Brian Crawford.

17 Q.   Okay.  You're still talking about Exhibit 545?

18 A.   Yes, I am.

19      MS. HANNA:  Your Honor, may I move Exhibit 545 into

20 evidence?

21      THE COURT:  Yes.

22      MS. HANNA:  Thank you.

23      (Received in evidence, Exhibit 545.)

24 BY MS. HANNA:

25 Q.   Let me go ahead and ask that you take a look at this

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    agenda.  And let me first ask, before coming out to make this

2    presentation, did Vestagen ask you to sign any kind of a

3    confidentiality agreement or a nondisclosure agreement?

4    A.    No.

5    Q.    Okay.  You recall, in looking at this exhibit, that this

6    was an agenda that they were providing you with respect to a

7    presentation about their company; is that correct?

8    A.    I'm sorry, can you repeat that?

9    Q.    Looking at this exhibit, does this refresh your

10   recollection that this was an agenda that Vestagen provided you

11   with respect to a presentation that they were going to give you

12   as to their company?

13   A.    Yes.

14   Q.    Okay.  And did they actually present a PowerPoint

15   presentation at that time?

16   A.    Yes.

17   Q.    I'd ask you to turn to Exhibit 544.

18   A.    Okay.

19   Q.    Is this a copy of the presentation that Vestagen provided

20   to you and Strategic Partners in March 10, 2011?

21   A.    Yes.

22          MS. HANNA:  I'd like to move Exhibit 544 into

23   evidence.

24          THE COURT:  Okay.  It will be received.

25          (Received in evidence, Exhibit 544.)

```
 1    BY MS. HANNA:
 2    Q.   Okay.  The first page of that indicates "Strategic
 3    Partners & Vestagen Technical Textiles, The Road Map Forward."
 4    Do you see that?
 5    A.   I do.
 6    Q.   Okay.  If we can quickly just go through the presentation.
 7    The second page, "Our Focus," talks about their marketing focus
 8    and their strategy; is that right?
 9    A.   Yes.
10    Q.   Next page over talks about the data that they have
11    accumulated through their surveys regarding medical apparel and
12    personal protection; is that right?
13    A.   Correct.
14    Q.   Next page talks about the background of their company.
15         Next, --
16    A.   Correct.
17    Q.   -- objectives?
18    A.   Yes.
19    Q.   Next, methodology?
20    A.   Yes.
21    Q.   Next are the results, which go through several pages?
22    A.   Correct.
23    Q.   I'm going to take you to 544-30.
24    A.   Okay.
25    Q.   "Impact of Market Transformation to VESTEX."  Do you see
```

1    that?

2    A.    Yes.

3    Q.    This was another piece of information they provided you?

4    A.    Yes.

5    Q.    Next, they talk about the influencing factor of market and

6    other branding strategies that VESTEX is bringing to the

7    market?

8    A.    Correct.

9    Q.    Okay.  Next page is evidence-based performance

10   requirements.  Do you see that?

11   A.    Yes.

12   Q.    And this was all provided to you at that presentation?

13   A.    Yes, it was.

14   Q.    Next, they provided you research that they were basing

15   their claims on; is that right?

16   A.    Correct.

17   Q.    Okay.  All of this was provided to you without any kind of

18   confidentiality or nondisclosure agreement?

19   A.    That's correct.

20   Q.    Okay.  Following this presentation, did Mr. Favret reach

21   out again to Vestagen regarding an opportunity to partner with

22   them or for an investment?

23   A.    To reach out to us, Strategic Partners, yes, he did.

24   Q.    Okay.  Can I ask you to turn to Exhibit 548, please.

25   A.    Yeah.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   Q.   For the record, this is a letter on Vestagen's letterhead

 2   dated September 14th, 2011.  It's Exhibit 55 -- I'm sorry, 548

 3   through 548-27.

 4        Is this a true and correct copy of the letter and

 5   enclosures that you received from Mr. Favret on that date?

 6   A.   Yes.  These 27 pages, correct.

 7             MS. HANNA:  I'd like to move Exhibit 548 into

 8   evidence, Your Honor.

 9             THE COURT:  It'll be received.

10             MS. HANNA:  Thank you.

11        (Received in evidence, Exhibit 548.)

12   BY MS. HANNA:

13   Q.   So again, this letter is following up on a conversation

14   with respect to the interest by Vestagen to partner with

15   Strategic Partners.  Do you see that?

16   A.   Yes.

17   Q.   Attached to this letter, if we can go to the next page, is

18   Vestagen's mission and VESTEX vision and includes their

19   marketing and branding protocol; is that correct, sir?

20   A.   Correct.

21   Q.   Next page, 548-3, the emerging problem in healthcare and

22   their focus in terms of how they would address that?

23   A.   Yes.

24             THE COURT:  Okay, Counsel, I'm going to interrupt at

25   this time anyway.
```

1      It's 11:30, so it's time for your lunch break.

2      Remember the admonishment not to discuss the case among

3  yourselves or with anybody else or form or express any opinions

4  about the matter until it's submitted to you and you retire to

5  the jury room.

6      We'll see you back in at 1:30, and it's looking like we

7  will probably break at 3:30 this afternoon, so you can make

8  plans accordingly.

9          THE CLERK:  I'm sorry, Judge, was lunch at 1:00

10  o'clock?

11          THE COURT:  I'm sorry.  Come back at 1:00 o'clock.

12      Thank you very much.

13      We come back at 1:00 o'clock, start right up at 1:00

14  o'clock, and we'll go till about 3:30.

15      Okay.  We'll be in recess.

16          THE CLERK:  All rise.

17          MR. VERDE:  Your Honor, may we address the Court

18  outside the presence of the jury?

19          THE COURT:  Sure.

20      *(Outside the presence of the jury:)*

21          THE COURT:  Okay.  The jurors have left the courtroom.

22      You may have seats.

23      You may step down, sure, yeah.

24          MR. VERDE:  Your Honor, real briefly, seems like we're

25  going into an area that's outside of the initial complaint and

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    is going into the --

 2              THE COURT:  Going into the counter-claim a bit, yes.

 3              MR. VERDE:  That's correct, Your Honor.  I just want

 4    to make sure I preserve the right to bring in Mr. Singer back

 5    in order of my case and --

 6              THE COURT:  Oh, yes.  And when I ask -- any witness.

 7    When I get to the point where a witness is finished and I say

 8    can this witness be excused, if you want them to remain, not

 9    remain but be on call, just tell me at that time and we'll make

10    sure they're still on call.

11              MR. VERDE:  Thank you, Your Honor.

12              THE COURT:  Okay.

13              MR. VERDE:  Because I do intend -- once the defense

14    closes, I intend to open my case with Mr. Singer and with all

15    the availability --

16              THE COURT:  That's fine.  And you may or may not want

17    to cross-examine here or you may want to wait until your case

18    in chief.

19              MR. VERDE:  That's correct, Your Honor.  Thank you.

20              THE COURT:  Thank you, Counsel.

21              THE CLERK:  All rise.

22              MR. DARMSTADTER:  Your Honor, sorry, counsel for

23    Vestagen filed an emergency motion last night, and we were

24    wondering if we could address it with the Court.

25              THE COURT:  I haven't seen it.  I'm going to have to
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1  take a look at it.  I haven't seen it.

2          MR. DARMSTADTER:  Thank you, Your Honor.

3          MR. VERDE:  Thank you, Your Honor.

4          THE CLERK:  Court is in recess.

5

6      *(Lunch recess commenced at 11:34 a.m.)*

7

8      *(Afternoon proceedings under separate cover.)*

9

10

11                      *--oOo--*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1                            CERTIFICATE

 2

 3        I hereby certify that pursuant to Section 753,

 4   Title 28, United States Code, the foregoing is a true and

 5   correct transcript of the stenographically reported proceedings

 6   held in the above-entitled matter and that the transcript page

 7   format is in conformance with the regulations of the

 8   Judicial Conference of the United States.

 9

10   Date:  SEPTEMBER 21, 2017

11

12

13

14                    /S/ SANDRA MACNEIL
                      _____

15                    Sandra MacNeil, CSR No. 9013

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA